**RIGGS INVESTMENT MANAGEMENT CORPORATION, et al., Plaintiffs,**

v.

**COLUMBIA PARTNERS, L.L.C.,** Investment Management, et al., Defendants.

Civil Action No. 96–0014 (RCL).

United States District Court, District of Columbia.

May 12, 1997.

Eva Petko Esber, Regina G. Maloney, Michael K. Ross, Williams & Connolly, Washington, DC, for Plaintiffs.

David Webster, James Sottile IV, Nathan D. Finch, Caplin & Drysdale, Washington, DC, for Defendants.

### MEMORANDUM OPINION

LAMBERTH, District Judge.

The court conducted a bench trial of this case from January 13,1997 through January 17, 1997, and hereby makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### FINDINGS OF FACT

Plaintiff Riggs Investment Management Corporation ("RIMCO") manages investment funds for individuals, pension funds, and other corporate and institutional investors. RIMCO is a wholly-owned subsidiary of Plaintiff Riggs Bank, N.A. ("Rigg"). Tr. 43–44 (Dudley).

From January 1990 through September 1995, RIMCO achieved an exceptional performance record in equity investments, and its assets under management—the money it invested for clients—went from approximately $1.4 billion dollars to over $2.5 billion dollars. Tr. 410 (von Pentz). Year-to-year and quarter-by-quarter, RIMCO's portfolios generally outperformed the relevant indices—the S & P 500 for "large cap" stocks and the Russell 2000 for "small cap" stocks. Tr. 527–28 (Tasho); PX 101 A–D.

In June 1989, defendant Robert von Pentz left a competitor, American Securities Bank Capital Management ("ASB"), to become RIMCO's Managing Director of Equity Strategy and Management. When von Pentz became CEO of RIMCO in January 1990, he hired Philip Tasho, a former ASB colleague, as von Pentz's replacement as the head of equities at RIMCO. Tr. 347–48, 353–56 (von Pentz). Von Pentz served as Chief Executive Officer, Chief Investment Officer and Chairman of the Board of RIMCO from late 1989 until his resignation on September 28, 1995. Tr. 322, 347 (von Pentz); DX 1 at T109, DX 5, 122–127; PX 116.

In June 1994, Tasho went to Tim Coughlin, the president of Riggs National Corporation, and told him he had an offer of employment from Shawmut Investment Advisors in Boston. He said he would stay at RIMCO, however, if Riggs fired von Pentz and put Tasho in charge of RIMCO. Tr. 529, 657, 665–66 (Tasho). Riggs declined and Tasho was ordered to submit his resignation. Tr. 362 (von Pentz), 665–66 (Tasho). Tasho left RIMCO for Shawmut in June 1994, and another RIMCO employee, Clifford Dyhouse, followed Tasho there in September. Tr. 360, 364–65 (von Pentz).

Following Tasho's departure from RIMCO, von Pentz resumed day-to-day responsibility of selecting the stocks for all of RIMCO's equity portfolios. Tr. 350, 362 (von Pentz). He recruited Gary Dickinson from Riggs' Trust Department in early 1995 to assist him, and hired Dan Goldstein to take over Dyhouse's responsibilities. Tr. 362–65 (von Pentz). In a memo to Riggs executives on July 21, 1994, written shortly after Tasho's departure, Coughlin wrote, "Bob [von Pentz] has displayed continuing loyalty to Riggs ... and has shown real leadership in rallying the remaining RIMCO employees in the aftermath of resignations by Messrs. Marshall and Tasho." DX 30.

Von Pentz renewed his employment contract with RIMCO that very month. The contract, which extended through December 31, 1995, entitled von Pentz to an annual salary of $175,000, as well as additional incentive compensation based on RIMCO's profits and performance. (PX 7). In July 1995, Tim Coughlin and Henry Dudley—successor to George Grosz, head of Financial Services at Riggs Bank—met with von Pentz to discuss a possible extension of his employment contract, which was set to expire December 31, 1995. Tr. 41–42, 50–51 (Dudley), 383 (von Pentz); PX 7. Von Pentz was not eager to enter into a new contract, but was willing to listen to Riggs' proposal. He wanted an equity interest in RIMCO as an inducement to enter into any new contract, Tr. 65–66 (Dudley), 383–85 (von Pentz), but when Dudley and Coughlin finally presented von Pentz with a draft employment agreement in late September, it contained no provision for an equity interest in RIMCO, and the changes in terms from the existing contract were not particularly favorable to von Pentz. DX 3, 39; Tr. 387–89 (von Pentz). Von Pentz found the terms in the draft contract to be unacceptable, and told them he would not sign it given the other opportunities he had available to him. Tr. 66 (Dudley), 387–90 (von Pentz).

On September 28, 1995, more than three months before his contract was to expire, von Pentz resigned without advance notice. He immediately went to work for defendant Columbia Partners, an investment company in which he holds a ten percent interest. Tr. 286, 322 (von Pentz). Within two days, von Pentz hired eight RIMCO employees to join him at Columbia Partners, including everyone involved in marketing, client service, and equity investment. Tr. 84–86 (Addison).

On Monday, October 2, 1995, Columbia Partners officially opened for business at fully appointed offices on Pennsylvania Avenue, and Columbia Partners was actively soliciting investment clients, including RIMCO clients.

Tr. 230–31 (Collins). As a result of defendant von Pentz's actions in starting up his new business and hiring away RIMCO employees, plaintiffs have alleged breaches of fiduciary duty by von Pentz. As a result of the alleged actions of Columbia Partners, plaintiffs charge Lanham Act and unfair competition violations.

### Formation of Columbia Partners

Beginning no later than February or March 1994, von Pentz had begun discussions with Terry Collins, then the President of ASB Capital Management, a RIMCO competitor, about establishing their own investment management firm. Tr. 311–12 (von Pentz); Tr. 129 (Collins). Their plan was to join RIMCO's equity side with ASB's fixed income side. Tr. 126 (Collins).

By the summer of 1994, Collins and von Pentz were seeking investors for their prospective firm. They had a number of meetings with Putnam Lovell, a New York investment banking firm. Tr. 125–26, 273–74 (Collins); Tr. 312–13 (von Pentz). Although von Pentz claimed at trial that Putnam Lovell had not been "involved in any serious way with developing financial projections," Tr. 313, the evidence reveals that von Pentz did provide Putnam Lovell with information to assist it in creating projections for Columbia Partners. Von Pentz Dep. 193–96; Tr. 274 (Collins); PX 21.[1]

In the fall of 1994, Collins began discussions with Ruff Fant of Galway Partners, a D.C.-based merchant bank, about the prospect of Galway backing the new venture. Tr. 1011 (Fant); Tr. 126–27 (Collins). By early November 1994, Collins disclosed to Galway von Pentz's interest in the project. *See* PX 12. Galway was keenly interested in establishing an investment management firm. *Id.* Von Pentz and Collins understood that if they did not go forward with Galway, Galway would proceed with someone else. Tr. 135 (Collins).

In the first half of 1995, von Pentz was extensively involved in negotiations about the new venture. Tr. 1026 (Fant); PX 16, 22, 28,

29, 82. A final "Term Sheet" was signed on July 12, 1995, *see* PX 33–34A, and in August, Galway informed some prospective investors that Collins and von Pentz were committed to the project. PX 39, 120–21.

Well before the Term Sheet was signed, and at least since the beginning of 1995, von Pentz worked closely with both Collins and Fant to establish Columbia Partners as a "full blown company." Tr. 208–10 (Collins). With Galway, they agreed to establish a "turn-key" operation—one that would be ready to begin full operations immediately after von Pentz and Collins resigned their current positions.

The evidence establishes that from at least February of 1995, von Pentz participated in developing projections for Columbia Partners, and from at least April of 1995, shared information about RIMCO's employees and customers for inclusion in those projections. Tr. 313 (von Pentz); von Pentz Dep. 193–96; Tr. 127–28, 134–35, 273–74 (Collins); *see, e.g.,* PX 23, 28, 83–88. Galway needed the projections to ensure the feasibility of the project and to recruit investors. Tr. 1012–15 (Fant); Tr. 127–28, 135 (Collins); PX 26–27, 120–21.

In order to create a budget for the new firm so that he would know how much start-up capital was needed, Fant asked Collins and von Pentz to provide estimates of certain expenses such as employee salaries and the revenues from potential clients for the new firm. Tr. 1012–15 (Fant). Beginning in April, 1995, von Pentz sent spreadsheets to Collins and later, Pant, which contained his estimates of potential revenues and expenses for the new firm. Tr. 378–79 (von Pentz); PX 24, 25. These spreadsheets contained the names of several RIMCO clients and information concerning the size of the client's account, the fees that client paid, and von Pentz's estimate of the probability that the client would transfer its account to the new firm. Tr. 378–79 (von Pentz); PX 24, 25. Von Pentz's spreadsheets also listed the names and salaries of the RIMCO employees whom he hoped to recruit for the new venture. Tr. 378–79 (von Pentz); PX 24, 25.

---

1. "Dep." denotes citations to plaintiffs' deposition designations, copies of which were previously provided to the Court.

Defendants admit that some of the information provided by von Pentz to Collins and Fant was confidential to RIMCO, but contend it was not the type of confidential information which was particularly useful to a competitor, or which would cause competitive harm to RIMCO if disclosed. Tr. 380–82 (von Pentz). For example, the names of RIMCO's institutional clients are printed in its promotional materials, and von Pentz testified that many clients willingly disclose the amount of assets they have with different money managers. Tr. 379 (von Pentz); DX 5. However, von Pentz also disclosed information about the assets that RIMCO clients had under management and the fees that each client generated. Tr. 128–29 (Collins); Tr. 313–14 (von Pentz); Tr. 1012–13, 1026 (Fant); PX 36, 84–85. Von Pentz admitted that he had never previously shared such information about clients with any competitors, and that he did not have clients' consent to share information about their accounts. Tr. 314 (von Pentz). Von Pentz further acknowledged that the fees charged by investment managers are "a factor in the competitive balance between firms," though he believed it to be one of the least important elements in picking a money manager. Tr. 378 (von Pentz).

The projections von Pentz and Collins provided to Galway listed RIMCO employees and RIMCO clients that von Pentz intended to recruit for the new company, identified which RIMCO marketing employees had relationships with which targeted RIMCO clients, and estimated the probability that each client could be switched to the new venture. Tr. 128, 131–34 (Collins); Tr. 1012–13 (Fant); see, e.g., PX 24, 36, 68, 85, 87. Von Pentz also shared information about salaries and bonuses that would be needed to recruit RIMCO employees. Tr. 134–35 (Collins); see, e.g., PX 25, 36, 84–85.

Galway originally hoped to open Columbia Partners in April of 1995. PX 16 (GP 5499). Over the ensuing months, that timeline slipped several times. Tr. 137–38 (Collins). By the summer of 1995, however, all those involved were aiming to start Columbia Partners by what ultimately became its starting date, October 2, 1995. Id. at 138; PX 33, 120–21.

Throughout the summer of 1995, von Pentz and Collins provided input and approval concerning "pretty much every detail" of establishing Columbia Partners. Tr. 140–43 (Collins); PX 44, 48–49, 56, 58, 61–63. Von Pentz's input was sought on everything from finding office space and furniture, purchasing computer software, and designating the office layout, to placing phone outlets, and even selecting coffee for the office. PX 44, 49, 53, 66; Tr. 320 (von Pentz). Von Pentz also worked on setting salary and commission structures. PX 31, 40, 43, 62, 64.

### RIMCO Employees

Von Pentz acknowledged that in the summer of 1994, when he and Collins were seeking investors, he disclosed to RIMCO employees that he planned to start his own business, and that he hoped to take them with him. This, he said, was a result of the fact that two of von Pentz's superiors had previously left and taken others, then, when Tasho left he took Dyhouse, and when Marshall moved on, others were left "out in the cold." Von Pentz testified that he made it known that if he ever left, he would "try to find a home for everybody." Tr. 395–96 (von Pentz).

In July 1995, von Pentz told Curt Winsor of his "dream" to run his own company. That conversation prompted Winsor to discuss the subject with Tom O'Neill. Tr. 851–52 (Winsor). At approximately the same time, von Pentz had similar conversations with Louise Toler and Colleen Kelly. Tr. 969 (Kelly).

Throughout September 1995, von Pentz informed RIMCO employees of his imminent departure from RIMCO. On September 6, 1995, von Pentz told Lane that he would soon be leaving to start his own company, and asked Lane to join him. Tr. 887–88 (Lane); Tr. 398–99 (von Pentz). This conversation occurred as the two were flying to meet with Texas Scottish Rite Hospital, a client von Pentz had identified as one that Lane might bring over to Columbia Partners. PX 36. On September 19, 1995, von Pentz took Lane for a tour of Columbia Partners' future offices and informed Lane that he would be

resigning on September 28. Lane acknowledged that even though he was a RIMCO officer, he did not disclose to Riggs' management von Pentz's imminent departure out of personal loyalty to von Pentz. Tr. 887–88, 900 (Lane).

On September 14, 1995, von Pentz discussed his imminent departure with O'Neill on a flight back from Kentucky, where they had attended a meeting with Modern Welding and had entertained a trustee of the UIU Pension Trust ("UIU"). Tr. 763–64 (O'Neill). Von Pentz had identified Modern Welding and UIU as RIMCO clients that would likely follow O'Neill and von Pentz, respectively, to the new firm. Tr. 432–33 (von Pentz); PX 36. Von Pentz told O'Neill that he would be leaving RIMCO in the next several weeks; that he would be joining resources with another well-known entity; and that he would be running the equity side of the new venture.

On September 26, 1995, von Pentz and Winsor discussed Columbia Partners over lunch. Von Pentz told Winsor that he would be leaving at the end of the week and discussed Winsor's joining the new firm with responsibilities in marketing. Winsor's understanding was that he had a job offer, and that he had accepted it, though not explicitly. Tr. 853–55 (Winsor).

On September 27, 1995, von Pentz gave Louise Toler a tour of Columbia Partners' future offices, told her he was joining forces with Collins, and showed her a letter specifying the terms of her offer of employment at Columbia Partners. Tr. 401 (von Pentz).

Each of these RIMCO employees resigned on September 28, 1995. Tr. 898 (Lane); Tr. 766–68 (O'Neill); Tr. 856 (Winsor). Even though Winsor and O'Neill typically met with 10 to 20 prospective clients a month, as of their resignations from RIMCO on September 28, 1995 Winsor had only one scheduled RIMCO appointment and O'Neill had none. Tr. 860 (Winsor); Tr. 767–68 (O'Neill). Before von Pentz resigned, business cards for O'Neill, Winsor, and Lane had already been printed and were available at Columbia Partners. PX 71. Four other employees targeted by von Pentz resigned within days of von Pentz's resignation. Tr. 85 (Addison). Several offered to stay on at RIMCO while RIMCO made arrangements for their replacement, but RIMCO generally declined.

### RIMCO Clients

RIMCO reacted quickly to von Pentz's departure. RIMCO or Riggs executives contacted all of RIMCO's clients and informed them that von Pentz had resigned to join a new firm, and said his departure would not affect RIMCO's investment performance or its ability to provide investment management services, since the investment process von Pentz had been using was still in place at RIMCO. Tr. 104–115 (Addison); DX 42, 44–45. RIMCO also recruited Tasho and Dyhouse to return from Shawmut, and began telling clients and consultants of their imminent return almost immediately after von Pentz's departure. Tr. 114–15 (Addison), 842–43 (Hoffman). Tasho and Dyhouse rejoined RIMCO in November 1995. (DX 54). RIMCO's equity investment performance continued to out-perform the relevant indices over the fourth quarter of 1995. Tr. 115 (Addison).

In September 1995, von Pentz and Lane or O'Neill met with representatives of RIMCO clients targeted for Columbia Partners: Texas Scottish Rite, Modern Welding and UIU. Von Pentz had identified each client as a prospect to be brought to Columbia Partners by either himself, Lane, or O'Neill. PX 36. Lane first denied that it was unusual for him to travel so frequently and to travel with both O'Neill and von Pentz, as they had on the trip to see Modern Welding and the UIU trustee, but was impeached on this very point. Tr. 889 (Lane). Von Pentz admitted that he had never previously visited the UIU trustee at his home in Kentucky. Tr. 433 (von Pentz).

Von Pentz told two RIMCO clients that he would be resigning before he told Riggs management: UIU, one of RIMCO's largest accounts, and National Electrical Contractors Association (NECA). However, with respect to NECA, this notification preceded Riggs' notification by merely a few hours, and in the case of UIU this prior "notice" came during the course of a cocktail conversation with Howard Kluttz, a long-time friend of von

Pentz and an informal advisor to UIU. Tr. 406–09 (von Pentz); Tr. 57 (Dudley). Furthermore, Richard Hoffman, a UIU executive most importantly connected to the transfer of funds from RIMCO to Columbia Partners, testified that he first learned that von Pentz was leaving RIMCO after he had resigned. Tr. 835–37, 840–41 (Hoffman); DX 110. This news was a surprise to Mr. Hoffman. Tr. 840 (Hoffman). UIU and NECA both transferred their accounts to Columbia Partners in the first few days of the company's existence. Tr. 117–18 (Addison); DX 110.

Riggs also presented testimony from Fred Bollerer about his plans to expand RIMCO, and how he asked von Pentz to begin looking into this. It does not appear, however, that Bollerer actively pursued this avenue, and von Pentz indicated that he did not take Bollerer very seriously because Riggs was in the process of downsizing.

### Negotiations with Riggs' Management

At no time before September 28 did von Pentz tell Riggs' management of his intention to resign before the expiration of his contract. Tr. 322–23 (von Pentz); Tr. 59 (Dudley). Nor did von Pentz ensure that RIMCO would continue to operate after his resignation. Answer ¶ 34. But dark clouds were clearly on the horizon. In fact, Dudley testified that he sought new contract negotiations with von Pentz in the summer of 1995 because he feared von Pentz would leave.

Von Pentz testified that he told Dudley a week before his departure that he saw no reason to sign a new contract given that RIMCO provided him with nothing new or beneficial. He did say, however, that he would look over the contract again. Tr. 387 (von Pentz). Von Pentz did not officially tell Dudley of his intention to resign until the evening of September 27, 1997. At the time, Dudley was visiting a RIMCO client north of Pittsburgh, Pennsylvania. Though plaintiffs desire to show just how devastating von Pentz's resignation was to the organization, it is worth noting that Dudley did not fly back to Washington to perform even some modicum of damage control even though von Pentz called him the night before he quit to give warning. Von Pentz even offered to fly Dudley down to Washington on a private plane, but Dudley instead remained in Pennsylvania to play golf. The next day, von Pentz tendered his resignation to Tim Coughlin and Fred Bollerer. He declined a request to serve out his contract. DX 41; Tr. 411–12 (von Pentz).

The day after Columbia Partners opened for business, UIU, one of RIMCO's largest clients, transferred its account to von Pentz's new operation. Richard Hoffman, counsel to UIU, was concerned that a "disaster" could occur in the time it would take RIMCO to hire von Pentz's successor. But, Hoffman also stated, "[w]e liked the performance that Mr. von Pentz had given us. And he knew our portfolio. He knew—he knew us. And weighing all these factors, we decided to move the money." Hoffman recommended that UIU move its funds immediately. Tr. 846–48 (Hoffman); PX 81.

Riggs responded to its organizational breakdown by swiftly replacing von Pentz with his old colleague and former RIMCO employee, Philip Tasho as CEO.

### Columbia Partners' Promotional Activities

Within days of opening, Columbia Partners began a promotional campaign using RIMCO's successful five-year equity performance record. See PX 133–36. Columbia Partners disseminated RIMCO's five-year record with cover letters that described it as von Pentz's equity performance at RIMCO. Tr. 166–67 (Collins); PX 135, 136. Many such letters further stated that "all of the individuals that helped Bob produce those results are now with us at Columbia Partners." PX 134, 136; Tr. 167 (Collins). And in October 1995, Columbia Partners developed a document for promotional use ("Talking Points") that described RIMCO's five-year record as "our" (i.e. Columbia Partners') record and claimed that "our" record outperformed the various indices. PX 104; Tr. 281 (Collins).

Columbia Partners also used a set of performance "exhibits" comparing a five-year quarterly performance record with the relevant indices. Tr. 776–78 (O'Neill). These quarterly exhibits listed the performance as that of Columbia Partners and at no time gave credit to RIMCO. O'Neill testified, however, that he had no knowledge of giving

out one of these documents without disclosing in some manner that these were RIMCO numbers.

Columbia Partners also used a set of annual performance exhibits (PX 101A & B), that initially designated the yearly performance as that of "Columbia Partners." A footnote, in smaller typeface, stated:

*Investment results were achieved by the RIMCO equity research group. The group was led by Robert A. von Pentz and used an Investment process developed by him and implemented at RIMCO in 1989. The entire RIMCO equity research and trading group has joined Columbia Partners on October 1, 1995....

Although "Columbia Partners" was later changed to "Equity Performance" (PX 101B & 101D), the footnote remained unchanged. Tr. 154, 935 (Kelly).

Columbia Partners cannot determine with any certainty which performance exhibit materials were used at which times. Tr. 236 (Collins); Tr. 288–89 (von Pentz); Tr. 776–77 (O'Neill). Although defendants claim that the quarterly performance sheets (PX 101C & D) were used only with the annual performance exhibits (which carry the footnote), the only evidence supporting that testimony is from O'Neill. Tr. 778 (O'Neill). His testimony is contradicted by PX 166, an updated database information booklet for Columbia Partners which O'Neill prepared on October 23, 1995 and sent to Scott Olson, an investment consultant in Savannah, Georgia. RIMCO data is clearly presented as though it belonged to Columbia Partners, and the "Firm History" section states that "[t]he personnel of Riggs Investment Management Corporation (RIMCO) merged with the personnel of ASB Capital Management to form a new company."

Columbia Partners discussed RIMCO's performance history at many of the hundreds of one-on-one presentations it had. PX 211. In addition, Fant and others at Galway made statements to prospective clients based on the information contained in the Talking Points (PX 104) and may have distributed the document itself. Fant Dep. 263–64; Answer ¶ 42.

To understand the effects of distributing these materials, it is first necessary to understand who these items go to and for what purpose they are used.

### Consultants and Databases

Consultants are professionals who advise clients about which investment managers to hire. Answer ¶ 45. There are thousands of consultants, and their sophistication varies widely. Tr. 559–60 (Eisenberg). Mobius and PSN are commercial databases that contain information provided by investment managers. Consultants use these industry databases to screen potential money managers based on various criteria, including performance history. Tr. 561–64 (Eisenberg); Tr. 706–09 (Marco); Tr. 741–42 (O'Neill).

Through at least late December 1995, Columbia Partners provided RIMCO's five-year performance history in responses to consultant questionnaires. Tr. 743 (O'Neill); PX 162, 165–66, 169–73. Several such responses failed to mention that the performance had been generated at a different firm or that the performance was RIMCO's. See PX 162, 164, 166, 170, 173. However, the performance exhibits do state, in the "years with firm section" that all personnel had been at Columbia Partners for only one month. Several responses stated that all of RIMCO's equity personnel had joined Columbia Partners. See PX 162 (CP 6402), 164 (CP 6213), 169 (CP 6027), 170 (CP 6129), 171 (CP 6313), 172 (CP 6000). O'Neill also supplied RIMCO numbers as Columbia Partners' performance history to the consultant databases Mobius and PSN. PX 163, 167, 178; Tr. 691–92, 794 (O'Neill).

### The RIMCO Performance Record

A long and successful performance record is a significant advantage in the competitive field of investment management. A successful performance record sharply increases an investment management firm's chances of being considered for business. Indeed, many searches for investment managers require a minimum of three years performance, if not five years, for consideration. Tr. 566 (Eisenberg); Tr. 532–33 (Tasho); Tr. 736–39 (Marco).

The entire five-year RIMCO record was not generated by the Columbia Partners' equity team. Answer ¶ 9. Nor was everyone responsible for RIMCO's record employed at Columbia Partners, though their cover letters and performance exhibits gave the strong indication this was so. Answer ¶ 7, 49; Tr. 158 (Collins); Tr. 633 (Tasho). Most of the members of the Columbia Partners' equity team did not become members of the RIMCO equity team until 1994 or 1995. Tr. 289–90 (von Pentz). In addition, neither Philip Tasho, the Managing Director of Equity Strategy and Management at RIMCO from 1990 through June 1994, nor Cliff Dyhouse, Director of Quantitative Research, who both contributed substantially to the RIMCO equity performance record, has ever been employed by Columbia Partners. Answer ¶ 47; PX 159.

Within the first year of his arrival at RIMCO, Tasho assumed the bulk of the responsibility for the day-to-day task of selecting the stocks in the RIMCO "large-cap" (larger company) equity portfolio, although von Pentz continued to participate in many decisions. Von Pentz, in turn, handled the day-to-day responsibilities of selecting the stocks for RIMCO's "small-cap" portfolio. Tr. 348–49 (von Pentz), 469–70 (Tasho). In late 1992, Tasho also assumed management of the small-cap portfolio until his departure in 1994.

Clifford Dyhouse, who ran the quantitative research group at RIMCO from 1990 through September 1994, also played a significant role in RIMCO's equity performance. Answer ¶ 47. Dyhouse reported to Tasho, and his full-time responsibility was running the computer model, checking the integrity of the model's output, flagging data errors or changes in rank, and working with Tasho in making changes to the model. Tr. 472–74 (Tasho); Dyhouse Dep. 95–126.

In July 1992, von Pentz, Tasho, and a third individual, Roger Marshall, signed employment contracts expressly providing that each had "equal responsibility for all decisions . . . relating to the management of RIMCO." PX 118, 119. After the contracts were signed, Tasho took charge of equity management, whereas von Pentz assumed responsibility

for marketing, administration, and compliance. Tr. 491–92 (Tasho); Dyhouse Dep. 165–67, 206. Von Pentz was heavily involved in overseeing and training new marketing staff, which took him frequently out of the office between 1992 and 1993. Tr. 436–37 (von Pentz); Tr. 468–69, 493 (Tasho). The three employment contracts making von Pentz, Tasho and Marshall—who managed RIMCO's fixed income investments—co-equal managers was the result of their abortive attempt to leave RIMCO for another investment management firm. It is clear from the evidence and testimony presented in this case that von Pentz was more equal than the others, however. He received more in compensation, had more responsibility, and was viewed by Riggs management as the most important RIMCO personality, allowing von Pentz to retain his titles of Chief Executive Officer and Chief Investment Officer even after the contracts were signed, despite the fact that the employment agreements made Tasho, Marshall, and von Pentz equals.

Von Pentz retained ultimate responsibility for all RIMCO activities after July 1992, and it seems clear that Mr. Tasho still reported to Mr. von Pentz, despite what the contracts said. Tr. 355–57 (von Pentz). RIMCO's 1993 Form ADV filed with the Securities and Exchange Commission describes Mr. von Pentz as Chairman and Executive Director of RIMCO having "overall responsibility for investment management and advisory activities." (DX 125 at 55). Furthermore, George Grosz, former head of Financial Services at Riggs as well as an executive vice president of the bank, testified that, regardless of what the contracts said, von Pentz remained the person in charge of RIMCO, and Tasho and Marshall continued to report to von Pentz.

### The RIMCO Equity Model

Both von Pentz and Tasho contributed to the model that was ultimately used at RIMCO, though it is clear that von Pentz played the predominant role in the creation of the model. Von Pentz admits that he never had a four-factor model operational until after Tasho contributed the "PEG" factor, Tr. 333–34 (von Pentz); Tr. 521–22 (Tasho), and that Tasho and Dyhouse made improvements to the model at RIMCO. Tr. 352 (von Pentz),

Tr. 521 (Tasho). Nevertheless, von Pentz was without a doubt the main brain behind the model, which was one of RIMCO's reasons for hiring him in the first place.

In June of 1989, von Pentz moved from ASB to RIMCO, where he became the Managing Director of Equity Strategy. Tr. 335–36 (von Pentz); DX 17–20. Harold C. "Tim" Warner, RIMCO's CEO at the time, hired von Pentz to put into place at RIMCO his quantitative stock-picking philosophy using the computerized model which he had used at ASB. Tr. 335–38 (von Pentz); Warner Dep. at 4–13; DX 4. Prior to von Pentz's arrival, RIMCO picked stocks using an outside research service which followed a fundamental approach and Warner was not satisfied with RIMCO's equity performance. Warner Dep. at 7–8; Tr. 894–95 (Lane).

The process von Pentz put into place at RIMCO embodied a quantitative and disciplined philosophy of stock-picking which used a computer model to rank a universe of approximately 750 securities. The companies were ranked weekly by the computer based on four equally weighted factors: (1) a factor which measured the trend in analysts' earnings estimates for the company over the past three months, (2) a relative valuation factor, (3) a trend in stock price factor, and (4) a price/earnings to growth factor. Rigid rules were put into place which insured that only highly ranked stocks were included in the equity portfolio, and stocks had to be diversified among different sectors of the economy to further reduce risk. The 50–60 securities held in each equity portfolio were selected from those ranked highly by the model on the basis of research concerning these stocks, following principles established by von Pentz. Within several months of von Pentz' arrival, all of the stocks in RIMCO's equity portfolios were selected using the model and structure he put into place. (Tr. 336–46 (von Pentz), 467, 537–43 (Tasho); Dyhouse Dep. at 41, 44–54, 146–48, 171–72; DX 7 at CP 1178–79; DX 16, 21–22). It should be reiterated that even though there is a great deal of human effort which is applied in stock picking even after the model develops its list, RIMCO itself clearly found the model to be of primary importance in its money management to the extent that after von Pentz left, RIMCO reassured its clients of stability because von Pentz left his "investment management process"—read "model"—behind. DX 42.

### Statements Regarding the Columbia Partners Model

From the start, Columbia Partners claimed that its equity process included use of a sophisticated computer model equivalent to the RIMCO model. Tr. 868 (Winsor); Tr. 297–99 (von Pentz); Winsor Dep. 151–52; PX 164–66; Answer ¶ 44. In fact, Columbia Partners' model was not operational at all during the first few weeks of the company's existence. Tr. 906 (Goldstein). By the third week of October, a crude three-factor model existed, but it was not reliable for stock selection purposes. Tr. 298–300 (von Pentz); Tr. 906–08 (Goldstein); Dickinson Dep. 138–40. A reliable four-factor model was not available for several months. Dickinson Dep. 138–40.

Riggs complains that Columbia Partners deceived UIU about the quality of its model, but UIU itself has not complained.

### Columbia Partners' Awareness of Tasho and Dyhouse

Columbia Partners began to advertise its services, and these promotional efforts made heavy use of RIMCO's performance history, often co-opting it as its own. Tr. 151, 157–59 (Collins); PX 101A–D. Von Pentz and the former RIMCO employees knew that Tasho and Dyhouse had made significant contributions to RIMCO's equity performance record. Tr. 293 (von Pentz). Yet, von Pentz never mentioned these contributions to Fant at Galway until after plaintiffs complained. Fant Dep. 26–27.

Collins, the head of Columbia Partners' marketing group, knew Tasho from ASB and knew of Tasho's work in equities at RIMCO, Tr. 159–60, 168 (Collins), yet he authored many of the statements that everyone associated with von Pentz's "success" in equities at RIMCO was at Columbia Partners. Tr. 167 (Collins); PX 136.

Von Pentz knew about Tasho and Dyhouse. Tr. 293 (von Pentz). Dyhouse called von Pentz the weekend after he resigned

from RIMCO, Tr. 293–94 (von Pentz), and one of the UIU representatives specifically asked him about Tasho on Columbia Partners' first day of business, Tr. 302 (von Pentz).[2] Moreover, during October and November, "rumors swirled" about whether Tasho would be returning to RIMCO, Tr. 293–94 (von Pentz), and were a topic of conversation among von Pentz, Collins, O'Neill, and Kelly—the individuals responsible for the creation of Columbia Partners' marketing materials, Tr. 168 (Collins); Tr. 293–94 (von Pentz); Tr. 748 (O'Neill); Tr. 954 (Kelly).

Columbia Partners apparently had some reservations about claiming RIMCO's record. For one thing, the Association for Investment Management and Research ("AIMR"), an important voluntary organization for investment advisers which maintains guidelines for the behavior of investment managers, had specific rules as to how, if at all, data from one investment firm could be presented at another. Compliance with AIMR has importance for a firm's reputation. In the first weeks of the new business's existence, Kelly, the compliance officer, considered changing "Columbia Partners" to "Equity Team" on the performance exhibits, and specifying in the footnote that only the *current* members of the RIMCO equity team had joined Columbia Partners, which would comply with AIMR's rules. PX 122; Tr. 956–62 (Kelly). But neither change was implemented at that time. In fact, the footnote was never revised to reflect that only the current RIMCO team members had moved to Columbia Partners. Tr. 962 (Kelly).

A change in the performance exhibits was made in late October, from listing RIMCO's record under "Columbia Partners" to listing it under "Equity Performance," but only after Kelly had brought the AIMR rules to von Pentz's attention, PX 129, and discussed the matter with AIMR. Tr. 962–63 (Kelly). In that conversation with AIMR, however, Kelly failed to disclose the roles of Tasho or Dyhouse. *Id.* at 939–41 (Kelly). AIMR sent materials to Columbia Partners

regarding the use of performance history after a *merger* of firms, which may suggest it was confused about the status of the new organization. PX 125; Tr. 942 (Kelly). AIMR guidelines state that "the use of a predecessor's performance could be misleading if one or more individuals other than those at the successor organization played a role in the prior firm's strategy (other investment committee members), security selection (research analysts), or trading (if trading strategies are integral to the firm's overall strategy)." AIMR is not the law, but the fact that defendant Columbia Partners stated it was in AIMR compliance even though it had not given credit to Tasho or Dyhouse does raise questions about the honesty of Columbia Partners' advertising, as will be discussed below.

After the conversation with AIMR, Columbia Partners still did not conform to AIMR's guidance. Even without disclosing Tasho's and Dyhouse's roles, Kelly believed that to comply with AIMR standards, Columbia Partners could use the RIMCO record only as supplemental data, appended to Columbia Partners' performance. She then drafted a revised performance sheet (PX 128). Collins rejected it, however. Kelly wrote a memorandum to the files about her conversation with AIMR (PX 126) which she did not distribute. It is clear that Kelly felt discomfort with Columbia Partners' marketing materials after her conversation with AIMR. Tr. 943–47 (Kelly). Why she never publicized this remains a mystery.

At deposition, Kelly testified that, in the fall of 1995, she had read the AIMR portability rules (PX 129) and SEC no-action letters that explicitly state that it may be misleading to cite the performance history of a prior firm if someone else substantially contributed to that performance. Kelly had concluded that these materials did not apply because neither Tasho and Dyhouse were then em-

---

**2.** Obviously, then, UIU learned Tasho did not go to Columbia Partners and UIU still decided to move its money out of RIMCO over to von Pentz. This decision downplays Tasho's importance. If, as plaintiffs contend, it was Tasho who had the most crucial, day-to-day decision making with respect to stock selection, this should have been the deciding factor. But as UIU's Hoffman testified, it was von Pentz who was the figure that mattered most.

ployed at RIMCO.[3] Tr. 948–52 (Kelly).

### Defendants' Conduct with Respect to Consultants and Databases

In the very same questionnaires in which O'Neill provided RIMCO's performance history to consultants, he misled consultants about whether there had been any turnover in investment professionals. *See* PX 166 (CP 6096; no "turnover of personnel critical to the investment process" in the last 10 years), 170 (CP 6126; no turnover of "investment professionals" in last two years), 171 (CP 6313; no response to inquiry about "all portfolio managers who have had past responsibility for managing the product"). Accurate responses would have required revealing Tasho's role.

### Riggs and RIMCO Complain

On December 15, 1995, Riggs and RIMCO, through counsel, objected to Columbia Partners' use, in any way, shape, or form, of RIMCO's performance numbers. Fant Dep. 89–90 (Vol.II); PX 140. On December 21, 1995, Fant agreed on behalf of Columbia Partners, that "until further notice Columbia Partners L.L.C. will not orally or in writing associate itself with the RIMCO equity performance record." PX 152. He also indicated that there were no clients or potential clients who have been misled by the advertising, but asked Williams & Connolly for information about Tasho and Dyhouse. But this undertaking was not communicated to the staff of Columbia Partners, Tr. 171–73 (Collins); Tr. 965–66 (Kelly), nor was it complied with. *See* PX 153. Rather, the only directive to the staff was merely to stop using the performance exhibits. PX 149; Tr. 172 (Collins).

### The Statement of Correction and Retraction

On January 30, 1996, roughly a month after this lawsuit was filed, Columbia Partners distributed a document entitled "State-

ment of Correction and Retraction." PX 159. This Statement was not distributed until four weeks after it was ready for distribution, DX 70, and was not distributed until *after* Columbia Partners (1) had secured the business of a large new client (IBEW), Tr. 192 (Collins), DX 110; and (2) had submitted its materials to be included as a semifinalist for another client it ultimately secured, City of Laredo Fireman's Relief and Retirement Fund. PX 173; DX 110. Even when finally distributed, the Statement was sent in a packet of materials that included Columbia Partners' first quarter returns and a cover letter that made no reference to the Statement. PX 158; Tr. 180 (Collins).

### Columbia Partners' Guidelines For Presentations

Since February 1996, after the lawsuit was filed, Columbia Partners has operated under purported guidelines (PX 108, 111) that allow marketing employees to distribute RIMCO's performance record through September 28, 1995, as printed from the Mobius database. The Mobius "printout" contains a footnote, added by Columbia Partners, which states that Tasho and Dyhouse made "significant contributions" to that record, and that neither of them are employed by Columbia Partners.

These current guidelines (PX 111) only came into being after discovery revealed that earlier guidelines (PX 108, adopted after this suit was filed) had been violated by Columbia Partners. Answer ¶ 58; Tr. 189 (Collins). Specifically, the evidence demonstrates that O'Neill and Winsor, on several occasions, mailed out performance information, despite an explicit prohibition on mailing such information in the initial guidelines (PX 108). Tr. 754–57 (O'Neill); Tr. 864–65 (Winsor); PX 174. Another employee continued to credit the RIMCO record to von Pentz, without mention of Tasho. PX 160.[4] It appears that

---

3. Kelly testified that she believed that leaving out mention of Tasho would only be a problem if he were still at RIMCO, but since he was at the time working at Shawmut, Columbia Partners was not required to list him as a contributor to the RIMCO record. But the AIMR compliance records do not bear this out. Kelly, at deposition, said she read the AIMR guidelines before plaintiffs

complained, but at trial she said she hadn't read them until afterwards.

4. O'Neill's and Winsor's depositions were conducted on April 8 and 11, respectively. Columbia Partners' initial response was to revise the guidelines on April 11, in the midst of deposi-

while this did happen, it happened on a small number of occasions.

David Eisenberg is an investment consultant who advises Williams & Connolly on its retirement plans. Eisenberg met with Columbia Partners in May 1996 and questioned Columbia Partners' use of RIMCO performance numbers. Tr. 589–92 (Eisenberg). Columbia Partners told Eisenberg that "we use the same process, same analysis, with the same team" as at RIMCO. PX 210. This letter, dated June 1996, directly violated the guidelines by failing to give Tasho and Dyhouse credit for RIMCO's model or the RIMCO record.

### The Current Status of Consultants and Databases

At time of trial, Columbia Partners had yet to remove RIMCO's performance numbers from its submissions to consultants and the Mobius and PSN databases, although O'Neill had undertaken to update consultants and databases quarterly with Columbia Partners' performance numbers. Tr. 687–93, 749–50 (O'Neill); see PX 167 (PSN update).

Though now apparently removed from Mobius, at time of trial Mobius displayed, under Columbia Partners' name, a continuous performance history of six years from 1990 through 1996 by quarter. Tr. 621 (Eisenberg); PX 114. The RIMCO returns were not separated from the Columbia Partners' returns. Instead, they were "linked" to show an annual rate of return for 1995. Even though linking "is absolutely against the industry standard, the AIMR standard," Tr. 580 (Eisenberg), Columbia Partners claimed in Mobius that it was AIMR compliant. See PX 209; see also PX 167(PSN). Columbia Partners added a Mobius footnote crediting Tasho and Dyhouse. PX 112A.

O'Neill learned as early as October 1995, in a conversation with AIMR, that RIMCO's performance numbers could only be used as "supplemental information." Tr. 683 (O'Neill). O'Neill wanted to be able to link the RIMCO and Columbia Partners' numbers with RIMCO numbers to show a continuous record, but he learned from AIMR that he could not do so under any circumstances; he also learned the RIMCO numbers had to be separated from the Columbia Partners' numbers. Tr. 681–83 (O'Neill).

Rather than correct the Mobius database, O'Neill informed the Mobius representative to whom he had sent the Statement of Correction and Retraction that the questionnaire response was accurate. Tr. 685 (O'Neill). O'Neill testified that a Mobius representative informed him that Columbia Partners' data was "linked" in exactly the same way as all other new firms in similar situations. Tr. 794 (O'Neill). This reliance appears unreasonable, and O'Neill's testimony is unreliable on this point in the eyes of the court. Likewise, O'Neill's testimony that consultants and independent databases do not want updates any more than once a year is not credible. Tr. 796–97 (O'Neill). At any rate, he knew the material Mobius was presenting was inaccurate and O'Neill certainly did not strain himself to change that misrepresentation.

O'Neill admitted that Columbia Partners has obtained three relatively small clients through Mobius. Tr. 786–87 (O'Neill). Two came from a consulting firm named CMS, and another from the Corporate Consulting Group.

The issue now is what legal consequences attach to these actions.

### CONCLUSIONS OF LAW

### I. BREACH OF FIDUCIARY DUTY

▮ As the Chairman of the Board and CEO of RIMCO from mid–1994 through September 1995, von Pentz owed a fiduciary duty to both RIMCO and its sole shareholder, Riggs. This duty included an obligation of "undivided and unselfish loyalty" to his employer. *Maryland Metals, Inc. v. Metzner,* 282 Md. 31, 382 A.2d, 564, 568 (1978). Furthermore, as an agent, von Pentz had a duty to act solely for the benefit of his employer in all matters within the scope of his employment and to avoid conflicts of interest between his duty to his employer and his own self interest. *Id., citing C–E–I–R, Inc. v. Computer Dynamics Corp.,* 229 Md. 357, 183 A.2d 374, 379 (1962).

tions, to whitewash the offending conduct. PX 110.

But just as von Pentz owed a duty of loyalty to RIMCO, it is also clear that an agent may make arrangements or plan to go into competition with his principal before terminating his agency, "provided no unfair acts are committed or injury done his principal." *Mercer Management Consulting v. Wilde,* 920 F.Supp., 219, 232 (D.D.C.1996), citing *Science Accessories Corp. v. Summagraphics Corp.,* 425 A.2d 957, 962 (Del.1980). Thus, the privilege to compete is limited. The question in this case is whether von Pentz, stepped over the line between privilege and disloyalty. The court finds he did.

Von Pentz argues that his discussions throughout 1994 and into 1995 are properly privileged and preparatory. The fact that von Pentz was under contract with RIMCO at the time, or that he had some basic meetings with Collins, or even that he sent "feelers" out to possible investors does not breach the fiduciary duty of loyalty. However, it is clear that von Pentz shared confidential information about wages paid to RIMCO employees and fees paid by its clients. Von Pentz admits that this information was confidential to RIMCO but attempts to whitewash the situation by suggesting that, at least with respect to client fees, clients often disclose this information themselves, so no there was no harm done. The court believes otherwise. The disclosure of this type of information to Collins—who at that point was simply a RIMCO competitor—clearly breaches von Pentz's duty of loyalty to RIMCO. If the plan to establish Columbia Partners had fallen through, there was nothing to stop Collins from using that information against RIMCO. True, information about who RIMCO managed money for and what fees it charged may have been obtained from third party sources, but not without considerable effort. For von Pentz to just hand it over goes beyond his privilege to prepare for future competition—not to mention that von Pentz had pledged RIMCO that he would keep confidential exactly the type of information he in the end shared.[5]

The evidence also shows just how involved von Pentz was in even the most minute details of this "turnkey" operation—right down to whose office would go where and what kind of stationery would be used.

It is also clear that von Pentz pre-solicited employees, though these pre-solicitations were generally close to the time of his departure. Perhaps von Pentz was simply very excited about his upcoming job and wanted to share his happiness with his co-workers by offering them jobs as well. Whatever the reason, the evidence is clear that von Pentz was careless (or crafty) about letting co-workers know about his imminent departure, giving several the clear indication he was offering them jobs at Columbia Partners even though von Pentz was still Chairman of the Board at RIMCO. Most strikingly, the two marketing employees at RIMCO, Winsor and O'Neill had nothing on their calendars for the month of October or thereafter, even though they testified it was normal to have up to 20 appointments. Their lack of credible explanation for this deficiency was offensive to the court and is stark evidence of what the only credible explanation for their lack of planning could have been—that they knew, well in advance, that they were heading to Columbia Partners in October of 1995.

It is also worth noting that Ruff Fant of Galway Partners, Columbia Partners' bankroller, warned Collins in a letter of January 17, 1995 that neither either he nor anyone else associated with the new business were to breach any duties to their employers. Fant informed Collins that this would slow down Columbia Partners' opening, but said that it was central to the business operation to avoid any illegality. It placed special emphasis on pre– and post–resignation conduct, and included two court cases outlining breaches of duties by corporate officers. Though this may have been what is commonly called a "CYA" letter, it nevertheless put Collins on notice of how he was to behave. Collins forwarded these materials to von Pentz with

5. Von Pentz signed, in 1989, a confidentiality agreement with Riggs agreeing to "treat in strict confidence" bank business, including the affairs of its customers, which he would learn in the course of his employment. (PX 8). Further-more, the Riggs "Code of Ethics" stated that it would consider customer lists to be proprietary information, and forbade employees from disclosing that information to anyone not so entitled to it. (PX 9).

a note stating that the letter made for "stomach churning" reading. That von Pentz would then violate exactly the types of behavior cautioned against by his own backer indicates that von Pentz did not just make some mistakes, but instead knowingly breached his duties to RIMCO resulting in exactly the type of litigation of which Fant warned him. (PX 18).

■ Thus, there is no doubt that von Pentz breached his duty of loyalty to RIMCO. But for damages purposes, the question is when the breach occurred. Plaintiffs, obviously, seek to push this date back as far as possible. The court finds by a preponderance of the evidence, however, that von Pentz began to breach his duty of loyalty in April of 1995 when he shared salary information with Collins. As von Pentz knew the salaries of the RIMCO employees he wanted to bring over, he had to ensure that Columbia Partners could sweeten the deal to entice defections. But von Pentz had no right to disclose this clearly confidential information to Collins, even for budgeting purposes. True, this presents a difficulty to upper level executives who seek to build turnkey operations, but such is the price of being a highly paid corporate confidant.

■ It is true that while von Pentz was in breach of duty, RIMCO was performing exceptionally well in the marketplace. Von Pentz is obviously a talented money manager. But this does not excuse his disclosure of confidential RIMCO information to Collins. In preparing to compete an employee may not commit fraudulent, unfair, or wrongful acts, such as the misuse of confidential information, or soliciation leading to a mass resignation of the firm's employees. *Science Accessories*, 425 A.2d at 965. Von Pentz did misuse such protected information, and he also pre-solicited employees while still an employee of RIMCO himself. The fact that RIMCO's entire current equity team followed von Pentz to Columbia Partners is proof positive that von Pentz's scheme worked.

■ Plaintiffs seek to recover von Pentz's compensation for the time during which he was in breach. As no compensation is owed an employee who has breached his duty of loyalty to his employer, plaintiff is entitled to its return. *Radio TV Reports, Inc. v. Ingersoll*, 742 F.Supp. 19, 23 (D.D.C. 1990). Given the court's finding that this occurred in April of 1995, he must forfeit any compensation he earned from that point until his resignation on September 28, 1995—a six month period. As Von Pentz earned an annual salary of $175,000 during this time, he must tender one-half of this to the plaintiffs, plus any bonus money earned during that period. He must also tender any other compensation earned during the breach.[6]

■ Plaintiffs seek as well to recover a portion of the equity fees earned by Columbia Partners from clients who transferred their accounts from RIMCO, arguing that disgorgement of profits earned as a result of a breach of fiduciary duty is an appropriate remedy. *United States v. York*, 890 F.Supp. 1117, 1131 (D.D.C.1995). RIMCO argues that the fees Columbia Partners earned during the first three months of its existence are a "conservative measure" of the damages von Pentz caused. Alternatively, it seeks the fees UIU, one of RIMCO's largest clients, paid, totalling over $100,000. It is clear from the evidence that while von Pentz may have pre-solicited employees, he cannot be said to have pre-solicited clients who transferred their assets under management from RIMCO to Columbia Partners. There is no real evidence of pre-solicitation of any RIMCO client, except for the fact that von Pentz made an unusual trip to a trustee's home in Kentucky shortly before he resigned,—but this appears to have been more about pre-soliciting a RIMCO employee, O'Neill, on the way down than anything else. There is no palpable evidence that von Pentz did any actual pre-solicitation of any client at the time, however.

---

6. This does not include the money he earned as a bonus in 1994 which had been held in trust for him by Riggs Bank. This money is to be paid to von Pentz in a companion interpleader case, decided today in civil action no. 96–1734. However, the court will stay that payment until von Pentz satisfies the judgment in this case.

With respect to UIU, it is certain that von Pentz's breach of duty towards RIMCO had nothing to do with its transfer of funds. Columbia Partners cannot be penalized simply because UIU likes Richard von Pentz and wants him to continue to manage its money. Hoffman, instrumental in moving the funds, testified he was surprised to learn that von Pentz was leaving, and even though he was nervous that bad things could happen at RIMCO in the time it would take to hire a new Chairman, UIU above all wanted von Pentz in the picture. Columbia Partners cannot be forced to disgorge fees so earned.

Thus, on plaintiffs' breach of fiduciary duty count, von Pentz is ordered to pay six months wages to plaintiffs (April 1 through September 28, 1995) in the amount of $87,500.[7]

## II. *LANHAM ACT CLAIMS*

### A. *Violations of the Act*

■ Plaintiffs further allege that Columbia Partners' practices have run it afoul of the Lanham Act. The Lanham Act creates liability for false or misleading statements made in "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(b); *see Gordon & Breach Science Publishers S.A. v. American Inst. of Physics,* 859 F.Supp. 1521, 1532 (S.D.N.Y.1994) (citing cases). Because Columbia Partners' promotional activities reached a significant number of prospective clients and investment industry consultants, *see H & R Industries v. Kirshner,* 899 F.Supp. 995 (E.D.N.Y.1995), its full array of promotional activities fall within the Lanham Act, including: (1) promotional brochures, such as PX103,[8] (2) letters and other mailings sent to clients;[9] (3) oral statements made in-

person presentations or over the telephone;[10] and (4) information provided to investment consultants and industry databases, such as Mobius and PSN.[11] Defendants do not appear to dispute that their activities are covered by the Act; they dispute only whether or not they violated it.

■ To prove a violation of the Lanham Act, plaintiffs must show that Columbia Partners' advertising was: (1) false or misleading; (2) actually or likely deceptive; (3) material in its effect on buying decisions; (4) connected with interstate commerce; and (5) actually or likely injurious to RIMCO. *ALPO Petfoods, Inc. v. Ralston Purina Co.,* 913 F.2d 958, 964 (D.C.Cir.1990) (hereafter *"ALPO I"*). *See also, Dial A Car, Inc., v. Transportation, Inc.,* 82 F.3d 484, 488 (D.C.Cir.1996) (*citing ALPO I*'s five-prong analysis).

### 1. *False or Misleading*

■ It is clear that Columbia Partners advertised in a misleading manner. On numerous occasions, it assumed RIMCO's equity performance record as its own without properly indicating how it was achieved, intending to give the impression that there was no difference between Columbia Partners as it was constituted in the last quarter of 1995 and RIMCO's equity team from 1990 until then. But this was obviously not so. There are three particular areas of advertising which indicate the misleading nature of Columbia Partners' claims.

#### a. *Cover Letters*

Columbia Partners sent out numerous cover letters to consultants (plaintiffs include nine examples), informing them of von

---

**7.** The court notes that there are currently two separate actions pending, one by von Pentz and one by Riggs bank concerning funds earned by von Pentz and held in a trust fund, or earned as a stock option: civil action nos. 96–1734 and 96–1752. Opinions shall separately issue in those cases concerning the disposition of those monies.

**8.** *See Grant Airmass Corp. v. Gaymar Indus., Inc.,* 645 F.Supp. 1507 (S.D.N.Y.1986).

**9.** *See Mobius Management Sys. v. Fourth Dimension Software,* 880 F.Supp. 1005 (S.D.N.Y.1994).

**10.** *See Seven–Up Co. v. Coca–Cola Co.,* 86 F.3d 1379 (5th Cir.1996); *National Artists Management Co. v. Weaving,* 769 F.Supp. 1224 (S.D.N.Y. 1991).

**11.** *See Gordon & Breach Science Publishers, S.A. v. American Inst. of Physics,* 905 F.Supp. 169, 181 (S.D.N.Y.1995); *Mylan Laboratories Inc. v. Pharmaceutical Basics, Inc.,* 808 F.Supp. 446, 459 (D.Md.1992); *Williams Electronics, Inc. v. Bally Mfg. Corp.,* 568 F.Supp. 1274, 1282 n. 24 (N.D.Ill.1983).

Pentz's "outstanding record" "over the past six years" but then stating that "[a]ll of the individuals that helped Bob produce those results are now with us at Columbia Partners." But the evidence shows this not to be true. Philip Tasho was a key figure in producing RIMCO's results from, 1990 until 1994—and Columbia Partners knew this. Columbia Partners obviously wanted to advertise its track record, but it could not say that "all" individuals who helped produce it were now employed there without being misleading.

### b. *Performance Exhibits*

Performance exhibits which Columbia Partners enclosed with its cover letters or handed out at meetings further demonstrate this problem. It would be obvious to any person receiving a letter announcing that Columbia Partners had just opened that it could not have a nearly six year performance record on its first day in business. The footnote Columbia Partners used to explain this states that "[t]he entire RIMCO equity research and trading group has joined Columbia Partners on October 1, 1995." Though the entire group *as it existed on the last day of September 1995* did join Columbia Partners, the clear impression, by juxtaposing such a statement to a six year record is that the team remained the same throughout. The court finds this misleading. This becomes even clearer in light of some cover letters included with the performance exhibits which state that "Bob and 100% of his team are now with us at Columbia Partners." Again, the impression—a misleading one—is clear.

### c. *AIMR Compliance Listing*

Troubling to the court is Columbia Partners' representation of itself in the Mobius database as AIMR compliant. The court finds that Colleen Kelly, Columbia Partners' compliance officer, knew that Columbia Partners was not AIMR compliant but allowed that impression to be advertised. The court, by a preponderance of the evidence, finds that Kelly had read the AIMR guidelines—and the SEC no-action letters described therein—on how to properly present a firm's

performance record in the database. But Columbia Partners did not present its information that way, she knew it, she wrote a memo about it, but she apparently allowed it—until lawyers got involved. PX 126. Violation of AIMR does not, in and of itself, mean that the Lanham Act is violated. But to advertise oneself as meeting such an important industry standard while knowingly being out of compliance is false advertising.

Further, plaintiffs have demonstrated actual falsity on defendant Columbia Partners' part in its answers to several investment advisor questionnaires. O'Neill stated (1) that Columbia Partners was AIMR compliant since its inception and (2) in a questionnaire from Scott Olson of Investment Performance Services in response to the question, "[o]ver the last 10 years has there been turnover of personnel critical to the investment process" O'Neill checked "no." The court finds these statements to be lies or attempts to deliberately deceive. As well, O'Neill wrote that "on day one, all equity team members joined Columbia Partners continuing the same people and process," but proceeded to give five years of past performance. Columbia Partners team "on day one" was not the same as it was in 1991, plain and simple.

The court therefore finds that the first necessary element in a Lanham Act claim, that the advertising be false or misleading, has been established. Whether there is a continuing violation to the point that an injunction should be issued, however, will be discussed below, and the extent to which Columbia Partners acted willfully or in bad faith will also be discussed below.

### 2. *Actually or Likely Deceptive*

The second element of a Lanham Act claim is that the advertising must be actually or likely deceptive. To recover damages or obtain equitable relief under the Lanham Act, a party must show either 1) the challenged advertisement is literally false, or 2) while the advertisement is literally true, it is nevertheless likely to mislead or confuse consumers. *Johnson & Johnson \* Merck v. Smithkline Beecham,* 960 F.2d 294, 297 (2d Cir.1992). Here, actual falsity has been shown. And, when this occurs, relief can be

granted on the court's own findings without reference to the reaction of the buyer or consumer of the product. *PPX Enterprises v. Audiofidelity Enterprises,* 818 F.2d 266, 272 (2d Cir.1987) citing *American Home Products Corp. v. Johnson & Johnson,* 577 F.2d 160, 165 (2d Cir.1978).

█ It is plain that Columbia Partners' marketing and compliance staff were aware of Tasho's and Dyhouse's respective contributions to RIMCO's equity performance record from 1990 through mid–1994, and their substantial role in producing that record. The evidence also establishes that defendants understood that Columbia Partners' promotional materials were improper, yet they continued to distribute them until RIMCO complained—and in some instances, even after RIMCO filed this lawsuit.

█ If there were no actually false statements of advertising, a plaintiff must show that defendant's advertising was misleading or confusing to consumers. A plaintiff may shift this burden and presume actual consumer confusion where the evidence shows that the defendants engaged in a deliberately deceptive commercial practice. *See Johnson & Johnson,* 960 F.2d at 298–99 (2d Cir.1992); *Resource Developers,* 926 F.2d at 140; *William H. Morris Co. v. Group W. Inc.,* 66 F.3d 255, 258 (9th Cir.1995); *Mobius,* 880 F.Supp. at 1022. Here, plaintiffs have successfully demonstrated that defendants engaged in a deliberately deceptive promotional campaign, as just illustrated.

█ Though this court has found that Columbia Partners has advertised falsely, negating the need for RIMCO to prove confusion, even if Columbia Partners' advertising was literally true, defendants have utterly failed to rebut the presumption that prospective clients were deceived by their false and misleading statements—a presumption to which plaintiffs are entitled.[12] Although hundreds of prospective clients and consultants received Columbia Partners' false promotion-

al brochures containing RIMCO's equity performance record, Tr. 164–65 (Collins), no customers testified that they were not confused by the materials. Again, defendants' efforts to cite the distribution of the so-called "Statement of Correction and Retraction" falls far short of satisfying their burden.

Even if plaintiffs did not deserve burden shifting, the evidence still points to consumer confusion. As discussed above, an investment management firm must persuade consultants to send business its way. But consultant responses tended to indicate they did not did not understand that Columbia Partners was anything more than a merger of RIMCO and ASB personnel—which Columbia Partners was not. Plaintiffs would thus satisfy the confusion element even if the court had not found actual falsity.

### 3. *Material in Effect*

█ The court heard copious testimony concerning the importance of having a track record, and the lengths to which Columbia Partners went to "link" its one-quarter of a year performance with RIMCO's prior five years. As defendants' expert himself testified, a three-to-five year performance record is a prerequisite to an investment manager receiving his recommendation to a client. That such advertising is material in effect cannot be doubted.

### 4. *Interstate Commerce*

The advertising here is not disputed to have been interstate.

### 5. *Actually or Likely Injurious*

█ RIMCO and Riggs did not really attempt to prove at trial that they suffered actual damages as a result of Columbia Partners' alleged Lanham Act violations. They do cite to three very small clients who became initially acquainted with Columbia Partners after finding it on the Mobius database, where the information was presented

---

**12.** An expenditure of substantial funds in an effort to deceive consumers and influence their purchasing decisions relieves a plaintiff of the burden of producing consumer survey information supporting its claim. *Johnson & Johnson,* 960 F.2d at 299 *quoting Resource Developers,* 926

F.2d 134, 140 (2d Cir.1991). The rather impressive efforts Columbia Partners made in its nascent advertising campaign meets this level and shifts the burden to it to prove there was no confusion on the part of consumers.

improperly. But even then, plaintiffs did not show any causal elements. Though the court believes Columbia Partners' advertising was material in effect, whether it resulted in any actual injury is another question. As Marco testified, a consultant would never recommend an investment manager solely on the basis of a Mobius report, for example. There is no evidence that anyone invested in Columbia Partners as opposed to RIMCO based on any false statement or misrepresentation. And, when Columbia Partners became more open about how it began, how long it has been open, and who was and was not involved in equity investment at RIMCO, no investor left. Plaintiffs have not proven any actual damages resulting from false or misleading advertising.

Plaintiffs argue, however, that because the court has now found that Columbia Partners has made willful false statements, they need not prove actual damages. Rather, they have claimed as damages all of Columbia Partners' profits earned from the provision of equity investment services to its clients on the theory that Columbia Partners obtained all of its equity business through the use of false and misleading advertising. To recover a defendant's profits under the Lanham Act, the plaintiff must show that the defendant acted "willfully or in bad faith" to deceive customers at its expense. *ALPO I*, 913 F.2d at 965, 968; *Foxtrap, Inc. v. Foxtrap, Inc.*, 671 F.2d 636, 641 (D.C.Cir.1982) ("courts have insisted on a relatively egregious display of bad faith" to award a plaintiff the defendant's profits). "Willfullness" or "bad faith" requires some element of targeted wrongdoing and intentionally deceptive conduct before the defendant's profits are recoverable. *ALPO I*, 913 F.2d at 966–68. *See also George Basch Co., Inc. v. Blue Coral Inc.*, 968 F.2d 1532, 1540 (2d Cir.1992), *cert. denied*, 506 U.S. 991, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992).

As should already be obvious, Columbia Partners played fast and loose with the law in its opening months. Even now, as will be discussed below concerning injunctive relief, Columbia Partners has done all it can to come as close to the line of legality as possible. It was only after RIMCO complained to Columbia Partners about its advertising that Columbia Partners stopped using the RIMCO equity performance exhibits and sent out a Statement of Correction and Retraction to hundreds of third parties. It also implemented Guidelines drafted by its lawyers to ensure that the contributions of Tasho and Dyhouse to the RIMCO record were adequately disclosed, though it is also clear these guidelines were broken by various Columbia Partners employees.

The court finds that from October 2, 1995, when Columbia Partners began its business, it operated willfully and in bad faith with respect to its advertising, and plaintiffs are entitled to its equity profits beginning with that date. Columbia Partners began its attempts to straighten the record on January 3, 1996 in a letter from Ruff Fant, and it did not send out its correction and retraction letters until January 30, 1996, and these were most likely not received by the intended parties until a reasonable time afterwards, around February 15, 1996. While these letters are not wholly sufficient to undo the false or misleading impressions of Columbia Partners' initial promotional campaign, they are enough to bring it out of bad faith. Thus, the court will award defendant's profits from equity management from October 2, 1995 until February 15, 1996 to plaintiffs.[13]

Defendant Columbia Partners claims that an award of profits is justified only if plaintiffs are able to show that a significant portion of customers were actually confused or deceived by Columbia Partners' advertising. *AT & T Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1443 (3d Cir. 1994), *cert. denied*, 514 U.S. 1103, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995); *L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc.*, 9 F.3d 561, 575 (7th Cir.1993); *PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 271

---

**13.** Under 15 U.S.C. § 1117(a), a court, upon a finding a § 1125(a) violation, (and the requisite bad faith requirement of *ALPO I*) may award profits, damages, and costs, subject to equity principles. The court believes that awarding the four-plus months of profit to RIMCO in this case is in accordance with statute, case law, and principles of justice.

(2d Cir.1987). But these cases are inapposite as they do not address the bad faith question. Furthermore, the suggestion that a plaintiff must show actual confusion in a case where its competitor acted in bad faith in its advertising campaign is contrary to the effectuation of the Lanham Act. The Lanham Act does not prohibit false advertising "until it confuses the public." Rather, it prohibits false advertising. And in the D.C. Circuit, when bad faith is proven, a court may award defendant's profits. *ALPO I*, 913 F.2d. at 968–970.

▇ *Foxtrap*, 671 F.2d at 641–42 (cited with approval by *ALPO I* ) makes it clear that actual damages (which would result from actual confusion) need not be proven where defendant's profits are sought. "We believe the trial judge should state whether the award is based on defendant's profits, plaintiff's actual damages, or both, since each measure depends on different factors. Before making an award on the basis of defendant's profits, courts customarily require a plaintiff to show bad faith or willful infringement by the defendant....[A]ny award based on plaintiff's damages requires some showing of actual loss." Thus, the court believes that even without a showing that significant number of consumers were actually confused, a showing of bad faith will allow for the award of defendant's profits.

### B. *Columbia Partners' Profits*

The Lanham Act provides that plaintiffs need prove the "defendants' sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). Columbia Partners thus has the burden of demonstrating proper deductions from its revenues. Defendant did not bother to do this. Rather, defendant spent its time at trial attacking plaintiff's alleged inability to show actual confusion, and then relying, as a back-up position, that Columbia Partners had no "profits" because expenses exceeded revenues. Tr. 263 (Collins), Tr. 990 (Kelly). But in arriving at a loss for the company, Columbia Partners, through Colleen Kelly, admit-

ted it had not segregated operating expenses which are clearly attributable to the equity side of the business (*e.g.*, salaries of equity team employees; commissions paid on equity accounts). Tr. 999–1001 (Kelly).[14] Furthermore, Columbia Partners paid a whopping $1.1 million in bonuses for 1995, although it was in business for only three months. That figure alone eliminates the "loss" of $1.09 Million testified to by Kelly. Tr. 999 (Kelly). This strategy of showing contrived exorbitant expenses as a method of proving a loss has previously been treated with disdain by this court. *See, Avianca, Inc. v. Corriea*, 1993 WL 797455 *5.

So, to determine the amount of money the court will award plaintiffs, the court will begin by totalling the equity revenues for Columbia Partners for the fourth quarter of 1995 plus half of the first quarter of 1996, as this is approximately the amount of time for which the court has found Columbia Partners to be in bad faith. Columbia Partners received $145,413.85 in equity fees in the fourth quarter of 1995, and $239,314.80 in the first quarter of 1996—half of which is $119,657.40. Adding these together, Columbia Partners earned $265,071.25 during the time in which it acted in bad faith. PX 200.

As previously stated, plaintiff need show only defendant's sales. Defendant has the burden of proving deductions. As the defendant has not made a reasonable effort to prove those deductions, the court will make none. Therefore, plaintiffs are entitled to $265,071.25.

### C. *Injunctive Relief*

Plaintiffs have emphasized that the most significant relief they seek is injunctive, to stem what they believe is on-going competitive harm they have suffered from Columbia Partners' activities. Specifically, plaintiffs seek an injunction: (1) prohibiting Columbia Partners' use of RIMCO's performance record in any promotional activities of materials of Columbia Partners; (2) prohibiting any oral or written claims affiliating Columbia Partners and/or its employees with credit for

---

**14.** In reaching this conclusion, defendants simply estimated operating expenses from its equity accounts to be 47 percent of total expenses be-

cause 47 percent of Columbia Partners' revenues through September 30, 1996 were derived from equity accounts. Tr. 998–90 (Kelly),

the RIMCO equity performance record; and (3) requiring Columbia Partners to amend and correct its submissions to the Mobius and PSN databases, and consultants' questionnaires, to eliminate all references to the RIMCO equity performance record.

■ The Lanham Act specifically permits injunctions to halt continuing violations of the statute's provisions and to prevent future violations. 15 U.S.C. § 1116(a).[15] To be entitled to an injunction, in addition to materiality and use in interstate commerce, plaintiffs need only show that false or misleading statements are *likely* to cause injury to RIMCO.[16] As well, an injunction is appropriate to protect a plaintiff's reputation and good will. *Opticians Ass'n of Am. v. Independent Opticians of Am.*, 920 F.2d 187, 195 (3d Cir.1990).[17]

■ Perhaps RIMCO's most important asset is its track record, and this case is largely about just who is responsible for that track record. Plaintiffs, understandably, want to distance Columbia Partners as far as possible from it. But Columbia Partners is entitled to make *some* use of the "RIMCO record," if done fairly and properly. As the court has ruled, Columbia Partners did not use that record fairly in its opening months, and will forfeit profits as a result. For purposes of obtaining injunctive relief, the question is what use is Columbia Partners presently making, or likely to make, of the RIMCO record.

Most significantly, plaintiffs object to the way defendant describes itself in the Mobius and PSN databases, and on consultant questionnaires—the main sources of information consultants use when making their initial determinations about which money management firms to recommend.

Since the conclusion of the trial, Columbia Partners has asked Mobius to remove all RIMCO references from its database. This is a wise step. The practice of "linking" Columbia Partners' data to RIMCO's to produce a continuous six year record—which had been Columbia Partners' practice until now—is unacceptable, especially when Columbia Partners advertises it is AIMR compliant despite the fact that AIMR forbids such a practice.

But Columbia Partners need not obliterate all references to RIMCO. After all, von Pentz did play a major role in creating RIMCO's successful performance from 1990 through 1995. Despite the fact that Columbia Partners linked its numbers to RIMCO's, it did provide a footnote at one point, which read as follows:

The performance record reflected on this page was achieved by the Riggs Investment Corporation ("RIMCO") equity research department between 1990 and 1995. On September 28, 1995, Robert A. von Pentz, the former Chief Investment Officer and Chairman of the Board of RIMCO, and all of the members of the RIMCO equity research department as it was then constituted, left RIMCO to join Columbia Partners. Two persons who made significant contributions to the RIMCO performance record between 1990 and 1994 left RIMCO in June 1994 and September 1994 and are not with Columbia Partners. They are Philip Tasho, Managing Director of Equity Strategy and Management from January 1990 to June 1994, and Clifford Dyhouse, Associate Director and later Director of Quantitative Research from 1990 to September 1994.

PX 113. Advertising of this type is sufficient, so long as there is no "linkage" of data giving Columbia Partners a seamless five to seven year history. Columbia Partners now has approximately one-and-a-half year's

---

**15.** In addition to proscribing conduct, an injunction may require a party to take certain action. *See Lampkin v. District of Columbia*, 886 F.Supp. 56, 62 (D.D.C.1995); *see also* 11A Charles R. Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice and Procedure*, § 2941, p. 32–33 (2d ed. 1995).

**16.** *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 720 F.Supp. 194, 214 (D.D.C.1989), *aff'd in part and*

*rev'd in part*, 913 F.2d 958 (D.C.Cir.1990); *see also Resource Developers, Inc. v. Statue of Liberty–Ellis Island Foundation, Inc.*, 926 F.2d 134, 139 (2d Cir.1991).

**17.** *See also Church & Dwight Co., Inc. v. S.C. Johnson & Son*, 873 F.Supp. 893, 911–12 (D.N.J. 1994).

worth of data, and it may only represent itself as having that record. It is not misleading, though, for Columbia Partners to *refer* to RIMCO's record, so long as it does so in a manner which gives appropriate credit to the appropriate parties who developed that record. The information presented by Columbia Partners in the above footnote does that. The court cannot credit Eisenberg's testimony that mere references to RIMCO's record would be misleading. If anything, the evidence shows that consultant questionnaires or databases are only an initial step into selecting a money manager, and no investment consultant would recommend to a client an investment management firm based solely on a database or questionnaire response. It does appear true, however, that a firm without three to five years of performance is not likely to make even a first-cut. Even though Columbia Partners may not co-opt RIMCO's numbers as its own, it may present its own data in which it may refer to von Pentz's titles and roles at RIMCO, and that the entire RIMCO equity team as it was constituted in late 1995 left to form the equity department at Columbia Partners. But it may not give any other impressions described by this court as misleading. Any intimation that the whole RIMCO record was solely von Pentz's responsibility without the mention of Tasho or Dyhouse would be improper.

 Plaintiffs further complain that the present "Revised Guidelines for Presentation" which Columbia Partners uses in conjunction with presentations to consultants is inadequate. (PX 111). The court disagrees. As just stated, Columbia Partners may make reference to the RIMCO record, if done appropriately and in a manner avoiding confusion. The revised guidelines presently in use by Columbia Partners are fair and accurate, and adequately distinguishes the two firms. Plaintiffs believe these guidelines allow von Pentz to take too much credit for the stock selecting computer model, but this is not so.

It is not improper, for Columbia Partners to refer to its stock selection model largely as von Pentz's. After all, it is. The current guidelines say that "[t]he analytical strategy Columbia Partners uses is similar to the one developed and used by Mr. von Pentz at Maryland National Bank, ASB Capital and at RIMCO." The court finds this statement to be true and not misleading, especially in light of the additional caveat the guidelines provide—that Tasho and Dyhouse contributed "certain refinements to the strategy." True, Tasho did contribute the price/earnings ratio component, or fourth factor, but von Pentz is clearly the brain-child behind the model, and the evidence is quite persuasive on this point. Riggs management and even RIMCO itself seemed to think so.

 In short, Columbia Partners' present activities in advertising are acceptable. But this does not obviate plaintiffs' request for an injunction. The problem is that the court cannot have any confidence that Columbia Partners will maintain the status quo without injunctive relief. As plaintiffs have amply proven, it was virtually anything goes at Columbia Partners until plaintiffs complained, and even afterwards, up until and including the time of trial, Columbia Partners violated its own guidelines—by distributing the RIMCO record without one-on-one explanations of its relevance, by not getting clearance for any possible exceptions to the guidelines with the compliance officer, and by offering dubious explanations about why potentially misleading information was knowingly left in the Mobius database for presentation. *See, e.g.,* Tr. 754–57 (O'Neill); Tr. 864–65 (Winsor); PX 174.[18]

 An injunction should be determined by balancing the harm to the plaintiff, other means of avoiding such harm, and the relative inconvenience to the defendant. *ALPO I,* 913 F.2d at 972 *citing Foxtrap,* 671 F.2d at 640. The harm to RIMCO here is clearly the loss of business and goodwill. RIMCO per-

---

**18.** It was stipulated that Columbia Partners issued written guidelines for presentations on February 6, 1996, issued another memorandum to clarify these guidelines on April 11, and then distributed what is now the operative "Revised Guidelines for Presentations" on April 30, 1996.

More important than issuing guidelines, however, is obeying them, and that is why the court is less concerned with devising new and improved plans and is concentrating more on making Columbia Partners stick to the present ones.

formed very well from 1990–1995, and is entitled to keep others from profiting from that record. It is also apparent that there are really no means of preventing Columbia Partners from doing just that, other than by ordering injunctive relief—the court is simply not convinced that Columbia Partners will behave if left unsupervised. On the other hand, von Pentz and the personnel of Columbia Partners had much to do with the record developed at RIMCO and are entitled to let potential investors know that. Therefore, the court will attempt to narrowly tailor the injunction to stop the unfair advertising practices, but to do so in a manner which is fair to the defendant.

Therefore, the court will enjoin Columbia Partners in the following manner: Columbia Partners may not portray, either orally, in writing, or on a computer database, its performance record in a manner which "links" its record to RIMCO's. It may, however, refer to RIMCO's record in accordance with its current revised guidelines for presentation. Columbia Partners may also refer to its analytical model as outlined in the revised guidelines. The revised guidelines require face-to-face presentations, for example, before RIMCO's record is distributed, but also allow for exceptions to be made if first cleared with the compliance officer. The court agrees that the compliance officer may allow certain exceptions to the revised guidelines, but in no circumstance may such an exception permit "linkage" of records. When exceptions are made, Columbia Partners must notify RIMCO of what the exception is, and to whom it is being made. In short, then, Columbia Partners is enjoined to follow its revised guidelines for presentation, but with the caveats expressed by the court. Should Columbia Partners desire to revise again its revised guidelines within three years, it must petition the court for permission.

## CONCLUSION

Though this court has seen only a glimpse of the investment management profession, if anything is clear, it is that at its essence is the race for the buck, and those who can't grab it fast enough fall behind. That is not to say, however, that this is an evil business. Investment drives our economy, employs Americans, feeds families. But as the average person has no idea how to invest, there are experts who show us which businesses we can do the most for, and which will do the most for us. We thus reward those experts, investment managers, who successfully direct our hard-earned funds to companies and corporations which are productive to our society. By appropriately compensating these individuals, we encourage them to be more careful with our money, and lure those with great talent in this area to use that talent in the investment arena, as opposed to other, perhaps less lucrative occupations.

In this case, the court is presented with a man who may not have been paid according to his worth. The problem, however, is that some of the steps he took to increase his compensation—in conjunction with forming a new company in which he would have an equitable share in the profits—were forbidden by law. And that new company, in an effort to compete in a very intense marketplace, would also violate the law. Perhaps some of these behaviors were economically efficient, but our common law and our Congress have determined that efficiency is not always of paramount importance. Loyalty and fair-play are also prized values. Riggs and RIMCO do not necessarily hold a moral high ground in this litigation. They are just as competitive as Columbia Partners. But this is not a morality contest, it is about who violated the law. On that score, von Pentz and Columbia Partners overstepped their legal bounds, and for that the court will appropriately sanction them, providing proper relief for plaintiffs in the process.

For the reasons stated above, Robert von Pentz must forfeit the salary he earned from RIMCO between April 1, 1995 and September 28, 1995 in the amount of $87,500 for his breaches of his duty of loyalty to his employer. Furthermore, Columbia Partners will disgorge profits it earned from the equity portion of its business between October 2, 1995 and February 15, 1996 in the amount of $265,071.25 as a result of its violation of the Lanham Act. Furthermore, Columbia Partners will be enjoined from engaging in any

false advertising, in a manner in accordance with the above opinion.

A separate order shall issue this date, along with a final judgment.