**ARISTOTLE INTERNATIONAL, INC., Plaintiff,**

v.

**NGP SOFTWARE, INC., Defendant.**

Civil No. 05–1700 (TFH).

United States District Court, District of Columbia.

March 10, 2010.

J. Blair Richardson, Aristotle International, Falls Church, VA, Robert L. Bredhoff, Stein, Mitchell & Mezines, Washington, DC, for Plaintiff.

Jeffrey L. Karlin, Eric L. Yaffe, Iris Figueroa Rosario, Gray, Plant, Mooty, Mooty & Bennett, P.A., Washington, DC, for Defendant.

**UNDER SEAL**

THOMAS F. HOGAN, District Judge.

### MEMORANDUM OPINION

Pending before the Court are Plaintiff Aristotle International, Inc.'s ("Aristotle") and Defendant NGP Software, Inc.'s ("NGP") cross-motions for summary judgment, NGP's Motion for Leave to File a Supplemental Memorandum of Law in Support of Its Motions for Summary Judgment, Aristotle's "Motion for Leave to Treat Certain Facts as Non–Confidential," Capitol Advantage LLC's Motion for Leave to Intervene, Alison Gregor's Motion for Leave to Intervene and Unseal Certain Documents Filed With Summary Judgment Pleadings, and NGP's Motion to Take Deposition From Alison Gregor. Aristotle brings this action, claiming that NGP engaged in, and continues to engage in, false and misleading advertising, in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (2006), by marketing itself as a campaign software provider working only with Democrats and their allies when, through an agreement with Capitol Advantage, NGP sells its software to heavily Republican-leaning entities. NGP counterclaims that Aristotle violated the Lanham Act by publishing false and misleading comparative advertisements aimed directly at persuading consumers to

choose Aristotle's software over NGP's. After careful consideration of the parties' briefs, oral arguments, and the entire record herein, the Court will deny the summary judgment motions, as well as Ms. Gregor's Motion to Intervene and NGP's Motion to Depose Ms. Gregor. The Court will hold in abeyance NGP's Motion for Leave to File a Supplemental Memorandum.

## BACKGROUND

In 1983, brothers John Aristotle Phillips and Dean Aristotle Phillips created Aristotle International, Inc. ("Aristotle"), a company that sells campaign fundraising and compliance software to federal and state political candidates, party committees, and other organizations. Aristotle is non-partisan in that it has historically sold its software and products to both Democratic and Republican entities.

In 1997, Nathaniel Pearlman founded NGP Software, Inc. ("NGP"), a direct competitor of Aristotle in the political software market. Unlike Aristotle, NGP has always marketed itself as a partisan firm, stating on its website that "NGP seeks to be a responsible, dedicated partner to our clients, working toward our common goal: **Victorious Democrats**," Pl.'s Summ. J. Mot. Ex. 18 (dated Aug. 24, 2007) (emphasis in original), and that "People use NGP because ... they **TRUST** us—we are **PARTISAN** and work only with Democrats and their allies," Pl.'s Summ. J. Mot. Ex. 3 (dated Aug. 24, 2007) (emphases in original); *see also* Pl.'s Mot. Ex. 3 at 18 ("Trevelyan Dep."). NGP has never sold its products directly to a Republican federal or state candidate or party committee. Def.'s Stat. of Facts ¶ 4.

In 2004, representatives from Capitol Advantage, a non-partisan campaign firm looking to enter the software market, approached NGP about either buying NGP or entering into some form of resale agreement. Pearlman did not want to sell NGP, and the companies entered into a "PAC Partnership Agreement" ("PAC Agreement" or "Reseller Agreement") on May 25, 2004. NGP App. 16. Under this agreement, NGP agreed to license its political software to Capitol Advantage and to give Capitol Advantage the exclusive right to sell the software under its own private label, PACBuilder, "to corporations, trade associations, and right-leaning 527 nonprofit organizations." [1] PAC Agreement at 2. This licensing agreement also provides NGP with a degree of approval authority over Capitol Advantage's contracts with prospective PACBuilder purchasers or sub-licensees. Specifically, the agreement states that "[a]ny license or agreement for the ... software entered into between [Capitol Advantage] and a customer shall be reasonably acceptable to NGP." PAC Agreement at 2. The agreement also states that PACBuilder customers were "exclusive customers" of Capitol Advantage, PAC Agreement at 2, and that Capitol Advantage "will manage customer service for all of its clients," PAC Agreement at 4. Under the agreement, NGP receives a royalty payment on a per customer basis, which is the "higher of $200 per month or 20% of the monthly license fee that [Capitol Advantage] charges each customer that has executed a license or other agreement" for the software. PAC Agreement at 1. According to NGP, the royalties it receives pursuant to the PAC

---

1. An analogous clause concerning left-leaning organizations in the same section of the agreement is crossed out. The Court here assumes that the altered sentence is to be plainly read with the stricken words disregarded, such that it requires Capitol Advantage to refrain from selling PACBuilder "outside [*sic*] its licensed vertical markets unless pre-authorized by NGP."

Agreement represent 1 to 2 percent of NGP's revenue. Trevelyan Dep. at 45–46.

In late 2005, Aristotle brought this lawsuit against NGP, alleging that NGP engaged in and continues to engage in false and misleading advertising, in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (2006), by claiming to work only with Democrats and their allies when, through its agreement with Capitol Advantage, NGP sells its software to Republican-leaning entities. Aristotle asserts that NGP published misleading or false statements and advertisements on NGP's website as well as in various marketing documents.[2] Although Aristotle initially requested that the Court award it NGP's profits on a theory of unjust enrichment, Aristotle filed a second amended complaint in January 2007, seeking instead a permanent injunction prohibiting NGP from continuing its partisan advertising and a corrective statement. In April 2007, NGP, with leave of Court, filed a counterclaim alleging that Aristotle engaged in false and misleading advertising in violation section 43(a) of the Lanham Act. In its counterclaim, NGP seeks a permanent injunction prohibiting Aristotle from making false or misleading representations with regard to NGP's products and services and requiring Aristotle to take corrective action for any false or misleading representations it has made. Both parties now seek summary judgment.

## DISCUSSION

### I. CROSS MOTIONS FOR SUMMARY JUDGMENT

#### A. LEGAL STANDARDS

##### 1. Summary Judgment

■ Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). While the movant bears the initial burden of demonstrating that there are no genuine issues of material fact and that the court should render judgment on the legal issues in its favor, see Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), an adverse or nonmoving party may oppose a properly supported summary judgment motion by "[setting] forth specific facts showing that there is a genuine issue for trial," Celotex, 477 U.S. at 323, 106 S.Ct. 2548; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (the nonmoving party must establish more than a mere "scintilla of evidence" in support of its position). The nonmoving or adverse party "may not rest upon the mere allegations or denials of [its] pleading," Fed.R.Civ.P. 56(e). Should an adverse party fail to point to affirmative evidence that a genuine issue for trial exists, "summary judgment, if appropriate, shall be entered against the adverse party." Anderson, 477 U.S. at 257, 106 S.Ct. 2505 (quoting Fed.R.Civ.P. 56(e)). The Court must draw all justifiable inferences in favor of the nonmoving party, and accept the nonmoving party's evidence as true. Id. at 255, 106 S.Ct. 2505. Indeed, a nonmoving party will prevail if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Laningham v. U.S. Navy, 813 F.2d 1236, 1241 (D.C.Cir. 1987) (per curiam) (quoting Anderson, 477 U.S. at 248, 106 S.Ct. 2505). Accordingly, summary judgment is only appropriate if,

---

**2.** Specifically, to NGP's website, Pl.'s Summ. J. Mot. at 16, Ex. 18, NGP "marketing cover letters," Ex. 25, other marketing documents, Mot. at 10, Exs. 26–30, a blog entry by Nathaniel Pearlman, Ex. 37, and various pieces of deposition testimony.

"under the governing law, there can be but one reasonable conclusion as to the verdict." *Id.* (quoting *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505).

### 2. The Lanham Act

■ Under section 43(a) of the Lanham Act, "any person who . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125(a)(1)(B). To prevail on a Lanham Act false advertising claim, a plaintiff must show that the defendant's advertising was: (1) false or misleading, (2) actually or likely deceptive, (3) material in its effect on buying decisions, (4) connected with interstate commerce, and (5) actually or likely injurious to the plaintiff. *Fernandez v. Jones,* 653 F.Supp.2d 22, 32 (D.D.C.2009) (quotation and citation omitted); *Riggs Inv. Mgmt. Corp. v. Columbia Partners, LLC,* 966 F.Supp. 1250, 1267 (D.D.C.1997) (citing *ALPO Petfoods, Inc. v. Ralston Purina Co.,* 913 F.2d 958, 964 (D.C.Cir.1990)). In order to survive a motion for summary judgment, a plaintiff (or counterclaimant) must prove or at least raise a genuine issue of dispute as to each of these elements.

### B. ANALYSIS

#### 1. Aristotle's Claim

The Court cannot grant summary judgment on Aristotle's Lanham Act false advertising claim because genuine issues of material fact remain in dispute. In fact, the only element of this claim that remains undisputed is that NGP's advertising was connected with interstate commerce. *See* Def.'s Opp'n at 33.

#### a. Falsity

■ "A Lanham Act plaintiff must allege and prove that an alleged false or misleading representation of fact was literally false or misleading to the public or verifiably false or misleading." *Fernandez,* 653 F.Supp.2d at 32 (citations omitted). To satisfy this element, Aristotle must demonstrate that NGP's advertising is either literally false or at least likely to mislead or confuse consumers. *Riggs,* 966 F.Supp. at 1268 (citing *Johnson & Johnson * Merck v. Smithkline Beecham,* 960 F.2d 294, 297 (2d Cir.1992)); *American Home Products Corp. v. Johnson & Johnson,* 577 F.2d 160, 165 (2d Cir.1978) (explaining that if the Act did not encompass more than literal falsehoods, "clever use of innuendo, indirect intimations, and ambiguous suggestions could shield the advertisement from scrutiny precisely when protection against such sophisticated deception is most needed"). The crux of Aristotle's claim is that NGP's advertising is false because, while NGP promotes itself as serving only Democrats and their allies, NGP sells to and serves Republican-leaning clients through a confidential agreement with third-party software vendor Capital Advantage. *See, e.g.,* Pl.'s Summ. J. Mot. at 18 ("The truth is that NGP actually desires to provide, and does provide, its software and services for groups that support Republicans by wide margins over Democrats"). Although NGP clearly "works with" Capitol Advantage, Aristotle does not show that Capitol Advantage is not a Democratic "ally." Rather, Aristotle posits that (a) allowing a licensee, pursuant to a royalty arrangement, to market PACBuilder to a particular sort of client constitutes "working with" the licensee's clients, and (b) Capitol Advantage has

"right-leaning" clients that are not "allies" of the Democrats. Pl.'s Reply at 5–6.

In support of its theory, Aristotle points to various pieces of record evidence. For instance, Nathaniel Pearlman said that NGP sells to corporations and trade associations through Capitol Advantage. Pl.'s Reply at 5–6 (citing Pl.'s Ex. 1 at 242). Additionally, in an email explaining that Capitol Advantage will use NGP's website until it obtains enough clients to support its own, Tim Kovacs, NGP's director of custom database solutions, stated that NGP has a "partnership" with Capitol Advantage and that it will resell NGP's software with its own graphics and logos. Pl.'s Reply at 6 (citing Pl.'s Ex. 82). Similarly, in an email to Kovacs, Pearlman wrote, "this isn't like the end-user client, it's another company—a partner—that we want to have a fair share of the receipts from their/our clients." Pl.'s Reply at 6 (citing Pl.'s Summ. J. Mot. Ex. 49).

For its part, NGP claims that "since its inception NGP has only worked with Democratic candidates and party committees, and has refused to work with Republicans," Def.'s Summ. J. Mot. at 7 (citations omitted), and explains that "the [political action committees ("PACs")] about which Aristotle complains ... are considered neither 'Democrats' nor 'Republicans,'" *id.* at n. 7. *See also id.* at 4 ("NGP has not sold its products, directly or indirectly, to any Political Action Committee that contributes 100% of its funds to Republicans"). NGP contends that it is entitled to summary judgment on Aristotle's claim because Aristotle "fail[s] to rebut the undisputed fact that Capitol Advantage's clients are not NGP's clients." Def.'s Reply at 1; *see also* Def.'s Opp'n at 6 (suggesting that purchasers of rebranded software are not their clients). While NGP acknowledges that it has "advertised for many years that it works for Democrats and their allies,"

Def.'s Opp'n at 4, and that some of Capitol Advantage's clients contribute to right-leaning candidates and entities, Def.'s Opp'n at 6, NGP contends that its advertising is not false because NGP neither works with nor serves Capital Advantage's clients, Def.'s Opp'n at 5 n. 3; Def.'s Reply at 3–4. Rather, NGP asserts that it licenses its software to Capital Advantage who then sells the software to its own non-partisan clients, under its own private label, and that NGP receives no revenue directly from and does not work directly with Capital Advantage's clients. Def.'s Reply at 3–4.

Although Capitol Advantage sold PAC-Builder to non-partisan PACs, NGP further contends that Capitol Advantage is a Democratic ally in that its clients collectively gave more money to Democrats than to Republicans during the last election cycle, such that NGP's advertising is not false. *See* Def.'s Summ. J. Mot. at 7 ("Each of the clients of Capitol Advantage has always made contributions to at least some Democrats.... In recent reporting cycles for contributions to federal candidates, Capitol Advantage's clients have given 54% of their available funds to Democratic candidates, and 45% to Republican candidates") (citation omitted). In support of its argument, NGP points to the PAC Agreement, which provides: (1) that Capitol Advantage has the "exclusive right to market and license" a rebranded version of NGP's software, App. 16 at 1; (2) that purchasers of the rebranded software are "exclusive customers" of Capitol Advantage, App. 16 at 2; (3) that Capitol Advantage "manage[s] customer service for all of its clients," App. 16 at 4; and (4) that Capitol Advantage pays NGP a royalty based on a percentage of Capitol Advantage's business, App. 16 at 1. Pointing to the PAC Agreement and to one instance where Capitol Advantage backed away from a sale to a Republican entity after

NGP expressed discomfort, NGP also submits that it has the ability to "veto" prospective clients of Capitol Advantage.[3] Def.'s Summ. J. Mot. at 13–14; PAC Agreement at 2. Finally, NGP contends that "although the Reseller Agreement states that Capitol Advantage may sell to 'right-leaning 527s' it is undisputed that no sales have been made to such customers, and it is NGP's understanding that Capitol Advantage will never do so." Def.'s Summ. J. Mot. at 13.

NGP's advertisements do not provide a definition for the ambiguous term "allies." The parties dispute whether and to what extent PACs may simultaneously be "allies" of both Democrats and Republicans. Def.'s Summ. J. Mot. at 10. The Court, like the consumer, is left without a precise understanding of what persons or entities are intended to be considered within the category of "Democrats and their allies." The reader is left to imagine a Venn diagram, the overlapping area of which may reasonably vary within the bounds of the term's plain meaning or most sensible dictionary definition. Reasonable consumers may come to different conclusions regarding the extent to which "Democrats and their allies" is mutually exclusive with other politically-defined categories, and within which circle(s) "non-partisan PACs" or Capitol Advantage fall.

■ Despite underscoring the curious "right-leaning 527s" clause in the PAC agreement and contribution data for certain Capitol Advantage clients, Aristotle has not shown that NGP had any direct relationship with those clients. Indeed, there is no indication that NGP has even provided technical support to Capitol Ad-

vantage's customers. In sum, Aristotle has not shown that NGP "worked with" entities that do not fall within the contextual meaning of Democratic "allies." Therefore, Aristotle has not shown NGP's ambiguous statements to be literally false. Cf. The Scotts Co., 315 F.3d 264, 275–6; Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co., 290 F.3d 578, 587 (3d Cir.2002). Nonetheless, the Court finds that Aristotle has raised a triable issue as to falsity. Lacking a way to divine a specific meaning from the context of NGP's statements, the Court cannot, based on undisputed facts in the record, determine whether NGP's advertising is misleading or deceiving. See United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1182 (8th Cir.1998) (ambiguous statements that "have a tendency to mislead or deceive the consumer are actionable under the Lanham Act"); see also Coca–Cola v. Tropicana Prods., Inc., 690 F.2d 312, 317 (2d Cir.1982); American Home Products Corp., 577 F.2d at 165 ("the truth or falsity of the advertisement usually should be tested by the reactions of the public"). Taking all inferences in favor of the non-movant, the Court finds the question as to whether NGP's advertising was misleading in light of NGP's business relationship with Capitol Advantage and in light of the nature of Capitol Advantage's PACBuilder clients to be a triable issue of fact. Because that disputed fact is fundamental to the first prong of Aristotle's claim, neither party is entitled to summary judgment on the issue of falsity.

### b. Deception

■ If NGP has made explicitly false misrepresentations, then the Court may

---

3. Aristotle disputes this claim, citing Capitol Advantage's designated representative's testimony that he does not "believe" that NGP has the right to veto a Capitol Advantage sale to a corporation or other entity. Pl.'s Opp'n at 5

(citing Pl.'s Ex. 73 ("Kern Dep.") at 82). Aristotle also avers that at least one Capitol Advantage client donated only to Republicans in the 2005–06 election cycle. Pl.'s Opp'n at 7 (citing Pl.'s Ex. 71).

hold that deception exists without reference to consumer reactions. *Riggs,* 966 F.Supp. at 1268–69 (citing *PPX,* 818 F.2d at 272). But if NGP made implicitly false misrepresentations, then Aristotle must demonstrate that the advertisements tend to mislead or confuse consumers. *See Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.,* 960 F.2d 294, 298 (2d Cir.1992); *see also The Scotts Co. v. United Industries Corp.,* 315 F.3d 264, 276 (4th Cir.2002). Because the Court has not found NGP's advertising to be literally false, Aristotle is not entitled to the presumption of deception that follows literal falsity. Yet rather than providing extrinsic evidence to support implicit falsity, Aristotle argues that such evidence is not necessary because NGP's advertisements were inherently and deliberately deceptive. Even where such advertising is inherently or deliberately deceptive, however, some reliable evidence of intent or consumer reaction is necessary. *Cashmere & Camel Hair Mfr. Inst. v. Saks Fifth Ave.,* 284 F.3d 302, 316 (1st Cir.2002) (finding deliberate deception only after plaintiff presented direct evidence that defendants intended to mislead the public); *Riggs,* 966 F.Supp. at 1269 (same); *FTC v. Brown & Williamson Tobacco Corp.,* 778 F.2d 35, 41 (D.C.Cir.1985) (holding that a court requires evidence to find inherent deception). Here, Aristotle has provided no extrinsic evidence of deception. Neither has NGP refuted Aristotle's assertions sufficiently to demonstrate that deception was unlikely. Accordingly, neither party is entitled to judgment on this element.

### c. Materiality

To prove materiality, Aristotle must show that NGP's misrepresentations were "likely to influence the purchasing decision." *Cashmere,* 284 F.3d at 311–12; *The Scotts Co.,* 315 F.3d at 272. The parties dispute whether NGP's advertising has a likely effect on consumers' purchasing decisions. Aristotle points to deposition testimony of NGP employees stating that clients and prospects sometimes mention they like the fact that NGP works with Democrats, that some clients may feel more at ease working with an openly partisan vendor, and that partisanship can be a factor in someone selecting NGP. Pl.'s Summ. J. Mot. at 30–32. Aristotle bolsters its argument by way of reference to articles and consumer guides opining that partisanship influences consumers. Pl.'s Summ. J. Mot. at 31–32.

■ Although Aristotle's evidence supports a finding of materiality, NGP submits that Aristotle's own surveys belie any claim of material effect. NGP points out that, in Aristotle's surveys, no customer identified partisanship as a "primary reason" for not choosing Aristotle, nor did any customer include partisanship as an "important factor" in choosing a software vendor. Def.'s Summ. J. Mot. at 18. Rather, customers cited cost, customer support, and software capability as the most important factors. Def.'s Summ. J. Mot. at 18–19. Indeed, neither NGP nor Aristotle can deny that factors other than partisanship are relevant to their clients. *See, e.g.,* Phillips Dep. at 126:4–7 (discussing price as a factor), 123–4 ("Aristotle matches NGP's prices"). NGP further downplays the importance of partisanship, couching its decision to work only with the Democratic part of the market as a measure intended to motivate employees rather than sway potential customers. Yet NGP's partisan focus, as well its assertions concerning harm seem inconsistent with its contention that the alleged misrepresentations are not material. *See, e.g.,* Def.'s Opp'n at 32 (an injunction "precluding NGP from stating that it is a Democratic, partisan firm ... would clearly have an

enormously adverse impact...."). Nevertheless, taking all justifiable inferences in favor of the nonmoving party, the Court cannot conclude, based on the record evidence, that the alleged misrepresentation of which entities the firm works with is material in the eyes of consumers. The record evidence is insufficient to resolve the significant factual dispute as to whether NGP's partisan advertising affects consumers' purchasing decisions, such that materiality remains a triable issue of fact.

### d. Injury

 Finally, neither party is entitled to judgment on the injury element. To satisfy the injury element of a Lanham Act claim, the party seeking a permanent injunction must show that it is likely to suffer irreparable harm from the alleged false advertising. *Johnson & Johnson v. Carter–Wallace, Inc.*, 631 F.2d 186, 189 (2d Cir.1980) ("Something more than a plaintiff's mere subjective belief that he is injured or likely to be damaged is required before he will be entitled even to injunctive relief"). Even where the parties are in direct competition, the moving party must provide a reasonable basis to believe they are likely to be harmed as a result of the false advertising. *Id.* at 190. Aristotle sets forth only anecdotal and circumstantial evidence of likely harm. *See, e.g.,* Pl.'s Mot. Ex. 42; Def.'s Summ. J. Mot. at 19–20 (In Aristotle's surveys "[n]o Democratic client listed the fact that NGP services only Democrats and their allies as a reason for leaving [Aristotle]"). Nevertheless, taking all the evidence together, the Court is persuaded that a reasonable fact-finder could find a sufficient likelihood of injury. But factors such as whether consumers choose NGP because it is partisan, and the extent to which one firm's software is superior or better-suited for certain customers—each potentially important to an injury assessment—remain unsettled. Thus,

the undisputed facts in the record do not leave the Court in a position to award judgment to either party on this element.

### e. Disposition of Cross–Motions for Summary Judgment

In light of the disputed facts regarding falsity, deception, materiality, and injury, the Court cannot find that there is but one reasonable conclusion under the governing law as to whether NGP's advertising is false or misleading. As discussed below, triable issues of fact also exist concerning NGP's "unclean hands" defense. Therefore, the Court cannot grant summary judgment to either party on Aristotle's claim.

### 2. NGP's Counterclaim

NGP's counterclaim alleges that Aristotle "has engaged in a smear campaign, releasing comparative false marketing/advertisements of NGP's products and services that Aristotle knew were false and misleading." Def.'s Summ. J. Mot. at 37. NGP contends that "[d]uring discovery, NGP learned that ... Aristotle ha[d] engaged in a smear campaign, releasing comparative false marketing/advertising of NGP's products and services that Aristotle knew were false and misleading." Def.'s Summ. J. Mot. at 37. According to NGP, Aristotle is responsible for several false or misleading representations found in magazine advertisements, emails, mailed flyers, and on websites targeting NGP customers, encouraging them to switch from NGP to Aristotle. Def.'s Supp. Mot. at 11. NGP "seek[s] injunctive relief to preclude Aristotle from publishing any additional false and misleading advertising and seek[s] corrective action for the false and misleading advertisements Aristotle has already published." Def.'s Summ. J. Mot. at 37. NGP also seeks attorneys' fees and costs. Once again, the requisite connection with

interstate commerce is the only element not in dispute. Def.'s Summ. J. Mot. at 6 n. 5.

### a. Falsity

■■■ As evidence that Aristotle's advertising is false or misleading, NGP points to a number of advertisements, including those that (1) suggest that NGP does not work only for Democrats and their allies, (2) indicate that multiple users are switching from NGP to Aristotle, and (3) compare Aristotle's and NGP's products and services. Def.'s Summ. J. Mot. at 38–45. Once again, the Court is unable to determine, on the basis of undisputed facts in the record, whether the statements regarding who NGP works with are false or misleading for purposes of the Lanham Act. Pl.'s Reply at 5–6; Def.'s Reply at 1. With regard to the comparative advertisements, disputed material facts regarding, e.g., whether NGP provided a user manual during the relevant time period preclude summary judgment on this element. Pl.'s Opp'n at 42; Def.'s Reply at 20. The Court here addresses each of the publications alleged to be false or misleading:

### i. *February 2007 Issue of Campaigns & Elections Magazine*

The February 2007 issue of *Campaigns and Elections,* an industry publication, contains a comparative advertisement for Aristotle. Phillips Dep. Ex. 23; App. 42. The ad states, in pertinent part: "According to reports filed with the [FEC] for the 2006 election cycle, Democratic and Republican House campaigns that used Aristotle raised an average of $166,105.37 more than those using NGP software . . . ." NGP argues that the advertisement is false and misleading because it doesn't account for the "different demographics" served by the firms and that a "true apples-to-apples comparison" would reveal that Democratic candidates using NGP's software raised

more money in that election cycle than those using Aristotle. Def.'s Summ. J. Mot. at 40. Despite the possible merit of NGP's methodology, it has simply not shown Aristotle's ad to be literally false.

NGP further complains that the ad contains a misleading graphic, which looks like a bar graph comparing a fundraising average for Aristotle's clients with those of two competitors, including NGP. In May 2007, Aristotle's CEO sent a letter to the editor of Campaigns & Elections Magazine admitting that the chart in the ad "appeared to show a different disparity than actually exists," requesting a correction, and stating that "the chart from that ad without the numbers will not be used again." App. 43. In light of Aristotle's promise to refrain from using the chart without the accurate and cited numbers, and NGP's limited response with regard to that remedy, the Court finds that the matter is moot with regard to NGP's request for injunctive relief, but finds the ad relevant to NGP's "unclean hands" defense. *Cf. Consumers Union of U.S. v. General Signal Corp.,* 724 F.2d 1044, 1052 (2d Cir.1983); *Pfizer, Inc. v. Merial Ltd.,* 2000 WL 640669, *2 (S.D.N.Y.2000) (concluding that the plaintiff seeking preliminary injunctive relief "cannot show a likelihood of irreparable harm caused by a graph that [the defendant] is no longer using").

### ii. *Spring 2007 Issue of Campaigns & Elections Magazine*

Aristotle published another advertisement in the Spring 2007 issue of *Campaigns & Elections.* The banner of the ad states: "The Only Other Way to Raise as Much Money Could Land You In Jail." Williams Dep. Ex. 14, App. 44. The ad continues: " . . . you can have peace of mind knowing that only Aristotle guarantees your donations are processed and reported in a manner that is 100% FEC and state compliant." Readers are then direct-

ed to a link to the October 2004 issue of the Federal Election Commission Record, and directed to read a summary of the Advisory Opinion contained therein, entitled "Use of Contributor Information" NGP. The Advisory Opinion was issued in response to a request by NGP regarding its proposal to "upgrade" its software by offering the ability to access "information about contributions that the client's donors may have made to other political committees." FEC Advisory Op.2004–24 (Aug. 12, 2004) at 1. This information would be collected from the FEC's online public records. The opinion concludes that such use for commercial purposes is prohibited by the Federal Election Campaign Act, and FEC regulations, at least to the extent it concerns information about contributors other than PACs. *Id.* (citing 2 U.S.C. § 438(a)(4)). Neither the opinion letter, nor the summary referenced in the ad states that a violation of that statute could be a criminal offense punishable by imprisonment. Yet certain willful violations of the Federal Election Campaign Act are punishable by imprisonment, 2 U.S.C. § 437g(d), and NGP does not disagree that such an offense could "land you in jail." Neither does NGP allege that Aristotle's statement regarding its processing and reporting guarantee was untrue at the time the ad was published. Thus, the Court does not find the ad to be literally false or even misleading. It may, however, be relevant to show the relevant context at trial.

### iii. *"Robin Hood" Website*

NGP alleges that Aristotle published a website entitled "The Software Enquirer: Is English a Second Language for Software Robin Hood?" Philips Dep. Ex. 7,

App. 45. NGP asserts that "the website is misleading in that it suggests that NGP does not work for Democrats and their allies and . . . that NGP has entered into a side deal with another entity in order to sell its products and services to Republicans," Def.'s Summ. J. Mot. at 31, without putting NGP's relationship with Capitol Advantage in context. Def.'s Reply at 16. Specifically, the webpage speculates that ". . . NGP made a little deal with another company on the side to sell NGP software to grounds that may be a lot more friendly to the right than the left." App. 45. The Court cannot find this webpage to be false or misleading, but notes that this website may constitute evidence relevant to a factfinder considering the overall context of Aristotle's advertisements for purposes of the Lanham Act.

### iv. *2006 Political Data Management Analysis Ad*

NGP alleges, and Aristotle does not dispute, that Aristotle published a marketing document shortly before the 2006 Congressional elections comparing features of their respective political data management programs. App. 40. First, NGP complains of the ad's statement that NGP provides "[n]o instruction manuals." NGP explains that it does not provide a hard copy manual to clients, but instead maintains an online manual.[4] Def.'s Reply at 18 (citing Pearlman Dep. at 428). NGP shows that Aristotle should have been aware of NGP's manual at the time the ad was published by pointing to the deposition testimony of Aristotle's President: "I have seen a manual for NGP's campaign software quite some time ago, years ago." App. 4, D. Phillips Dep. at 186:9–12 (June 27, 2007).[5]

---

**4.** The 2004 PAC Agreement also refers to manuals: "NGP will provide . . . documentation on the usage and operation of the NGP product. . . . NGP will also provide all customer manuals and training materials for

adaption. . . ." PAC Agreement at 4 ("Customer Support").

**5.** Despite referencing Phillips' testimony, NGP does not specifically allege in its State-

In response, Aristotle focuses on the immediately preceding statement in the "Documentation" subsection of the ad, which says that Aristotle provides "[o]n-line help and Wizard, and [a] 200 page professionally printed and indexed manual." Pointing also to a complaint from a customer survey, and glossing over the mention of "[o]n-line help," Aristotle emphasizes that "it is undisputed that NGP does not provide a professionally printed and bound manual like Aristotle does." Pl.'s Opp'n at 41. Thus, Aristotle does not argue that NGP truly did not have an instruction manual in 2006, but instead implies that, in this context, the statement should not be taken as literally false. Context is important; it is common for a phrase to clearly narrow the meaning of the terms that follow it. *See generally Washington Dep't of Social Servs. v. Keffeler*, 537 U.S. 371, 384, 123 S.Ct. 1017, 154 L.Ed.2d 972 (2003) (discussing canons of statutory construction *noscitur a sociis* and *ejusdem generis* ). Whether the ad's statement regarding instruction manuals is misleading in this context is a triable issue, as the Court finds insufficient evidence in the record to make a finding of literal falsity under the summary judgment standard.

NGP further complains about the ad's statement that NGP uses "a third-party system" for credit card processing, and that pricing for the software is "approximately the same." NGP fails to substantiate its argument that the statement regarding credit card processing is false. It supports its argument regarding pricing, however, with price lists. NGP App. 62, 63. Emphasizing the word "approximately," Aristotle counters by confirming that it "matches NGP's prices." Pl.'s Opp'n at

42; Phillips Dep. at 123–4; Stoll Dep. at 24–26. Thus, the Court does not find the pricing statement to be literally false. Rather, the Court concludes that NGP has established a triable issue as to whether the 2006 Political Data Management Analysis ad's "pricing" statement was false or misleading.

### v. *2004 Year–End Offer*

NGP further complains of statements made in a 2004 ad encouraging NGP users to switch to Aristotle. App. 36. NGP alleges that a quote attributed to a "Former NGP User" is false, and that the ad's claims regarding "Faster Support" and "Smarter Support" are misleading. The ad states that "Only Aristotle employs FEC Compliance Experts who have worked at the FEC." NGP contends that it "also employs FEC compliance experts." Def.'s Summ. J. Mot. at 44 (citing Levine Aff. 12). Aristotle simply defends these claims as true. Pl.'s Opp'n at 42. The Court finds Aristotle's argument regarding the quotation and "Faster Support" claim to be unavailing and unworthy of discussion. Moreover, because NGP has not alleged that it employed former FEC Compliance Experts at the time of the ad's publication, they have failed to raise a genuine issue with regard to that claim. *See ALPO Petfoods, Inc. v. Ralston Purina Co.*, 720 F.Supp. 194, 205 n. 12 (D.D.C. 1989) (the challenged statements must be "false or misleading at the time they are made.") (emphasis in original); *Klayman v. Judicial Watch, Inc.*, 628 F.Supp.2d 112, 149 (D.D.C.2009). (Naturally, Aristotle should not make such a claim if it is not accurate, but there is no allegation that Aristotle has made a similar claim since 2004.)

ment of Undisputed Facts that it provided an instruction manual in 2006. *See generally* LcvR 7(h)(1). Nor has NGP provided a copy

of its instruction manual or a description of how customers accessed it in 2006.

NGP further alleges that a two-paragraph statement at the bottom of the ad "gave the market the false impression that, through [its 2004] advisory request letter, NGP was seeking to engage in improper or illegal conduct sanctioned by the FEC. Def.'s Summ. J. Mot. at 44. But as NGP has noted, "NGP and Aristotle are not dealing with lay customers. They are dealing with sophisticated consumers in a particular market—the market for computerized campaign finance and compliance software." Def.'s Summ. J. Mot. at 15 (citing Levine Aff. 14). Although the use of anonymous quotations and the characterization of a request for an advisory opinion as a proposed "scheme" is less-than-laudable marketing behavior, NGP has not shown any statement in this ad to be false or misleading. As such, the Court finds that there is no genuinely disputed issue with regard to it. The ad may, however, constitute relevant contextual evidence at trial.

### b. Deception and Materiality

Conflating the deception and materiality elements, NGP contends that "[o]ne cannot help but react to startling but false and misleading information on the front page of a prominent magazine that wrongly suggests that a campaign acts at its peril by using NGP's software," Def.'s Summ. J. Mot. at 45, and that there is a "strong likelihood that the material will impact consumers' purchasing decisions," Def.'s Summ. J. Mot. at 46 (referring to consumer reactions to Aristotle emails and citing Phillips Dep. at 50). Aristotle emphasizes the sophisticated nature of its customers, but offers no other rebuttal on the element of deception. With regard to the pricing statement, the *Campaigns and Elections* ad, and the 2006 Political Data Management Analysis ad, the Court finds that NGP has sufficiently demonstrated a "likelihood of deception or confusion on the

part of the buying public" such that deception remains a triable issue of fact. *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 720 F.Supp. 194, 214 (D.D.C.1989); *cf. PPX Enter., Inc. v. Audiofidelity Enter., Inc.*, 818 F.2d 266, 271 (2d Cir.1987) (discussing standard applicable to a competitor's request for injunctive relief pursuant to the Lanham Act).

Aristotle contends that NGP's evidence of materiality is insubstantial, at least with regard to the February 2007 Campaigns and Elections ad. Pl.'s Opp'n at 40. The Court agrees that the mere speculation provided is an insufficient basis upon which to grant judgment as to materiality, such that it also remains a triable issue.

### c. Injury

Neither party has offered extrinsic evidence of injury. Rather than providing or discussing extrinsic evidence of injury, NGP improperly cites a Second Circuit opinion for the proposition that injury is presumed here because a court "presume[s] irreparable harm where plaintiff demonstrates a likelihood of success in showing literally false defendant's comparative advertisements which mentions plaintiff's product by name." *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62 (2d Cir.1992). The quoted passage from *Castrol* refers to the standard for demonstrating irreparable harm where the movant seeks preliminary injunctive relief. Here, NGP seeks a *permanent* injunction. Courts in some Circuits may apply a presumption of irreparable harm in this context, *see, e.g., Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144 (2d Cir. 2007), but NGP offers no authority from this Circuit indicating that such a presumption is appropriate. Moreover, while many of ads NGP complains of do mention the company by name, NGP has not shown them to be literally false. Therefore, the Court finds that NGP is entitled to neither

a presumption of injury nor summary judgment. NGP has, however, demonstrated a likelihood of injury sufficient to survive Aristotle's cross-motion for summary judgment.

### d. Unclean Hands

 The equitable doctrine of unclean hands is potentially available as a defense in false advertising actions brought under the Lanham Act. *Am. Home Prods. Corp. v. Johnson & Johnson*, 654 F.Supp. 568, 590 (S.D.N.Y.1987). It is a long-standing principle that only those who behave with due regard for equity are properly entitled to it. *See Manual Enter., Inc. v. Day*, 370 U.S. 478, 526, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962); *Aktieselskabet AF 21 v. Fame Jeans, Inc.*, 511 F.Supp.2d 1, 13 (D.D.C.2007). Accordingly, the doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). Both parties raise the defense here based upon the same allegations discussed in their cross-motions for summary judgment.[6]

In deciding whether to apply the doctrine, the Court considers "the public and the competitors' interests in preventing the proliferation of false and deceptive advertising." *Id.* The defense may be rejected where, e.g., failure to grant an injunction would increase the damage inflicted on the buying public. *Id.* In other words, where it would be contrary to the public interest, turnabout is not fair play. Here, despite the expiration of the PAC Agreement, there is little indication that the nature of the parties' advertising campaigns is likely to change absent an injunction. So long as those campaigns are not misleading, no harm should result. But if consumers are materially confused by the advertising *sub judice*, they would likely suffer ongoing confusion and harm should the Court resolve this matter on grounds of unclean hands. Wary of such a result, and mindful of the public interest in the integrity of political campaigns and elections, the Court declines to apply the doctrine at this time. Moreover, due the same disputed issues that preclude summary judgment, the Court does not find a sufficient basis in the record to grant judgment as to unclean hands in favor of either party at this stage.

### e. Disposition of Cross–Motions for Summary Judgment

Genuine issues of material fact exist as to NGP's counterclaim, as well as to whether either party has engaged in behavior that warrants exercise of the unclean hands doctrine. Accordingly, the cross-motions for summary judgment on NGP's counterclaim will be denied.

### 3. NGP's Motion for Leave to File a Supplemental Memorandum

NGP seeks leave to file a supplemental memorandum asserting additional factual support for its unclean hands defense and its Lanham Act counterclaim. NGP alleges that after the last hearing in this case, Aristotle continued to engage in false advertising to NGP's detriment. NGP points to two websites, an online advertisement, and anonymous "mailers" sent to NGP customers. Aristotle opposes this motion but describes terms under which it would withdraw its opposition. The Court will

---

**6.** In this context, the improper conduct must relate to the same product or service alleged to have been the subject of the false ad. *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 720 F.Supp. 194, 215 (D.D.C.1989), *rev'd on other grounds*, 913 F.2d 958 (D.C.Cir.1990) (citation omitted). The parties do not dispute the potential applicability of the defense here, as their respective allegations of improper conduct all relate to the same controversy.

hold this motion in abeyance pending a hearing, holding open the possibility of additional dispositive motions and briefing on new allegations of unclean hands.

## II. ARISTOTLE'S CONFIDENTIALITY MOTION

### A. FACTUAL AND PROCEDURAL BACKGROUND

On August 4, 2006, the parties executed a Stipulated Confidentiality Agreement, wherein they agreed on terms concerning the designation, labeling, and treatment of certain types of information in connection with this case. Among other things, the parties agreed that their attorneys would make reasonable and good faith efforts to limit designation of Confidential Information to specific parts or sections of documents. Conf. Agreement ¶ 5 [Dkt. No. 22–1]. On May 2, 2007, this Court granted the parties' "Joint Motion on Stipulated Confidentiality and Protective Order," [Dkt. No. 49] and accordingly ordered that documents filed as confidential be sealed subject to further order of the Court [Dkt. No. 51]. In response to discovery requests, the parties produced some documents designated as confidential, consistent with the agreement. The parties included such documents as exhibits to their respective motions for summary judgment, which were filed under seal. [Dkt. Nos. 75, 76.] Around the same time, Aristotle challenged the designation of some information the PAC Agreement (filed under seal pursuant to the Stipulated Agreement and Protective Order) [7] [Dkt. Nos. 50, 53].

Aristotle seeks to treat as non-confidential two "facts contained in" the PAC Agreement: "(1) That NGP has entered a reseller agreement allowing Capitol Advantage to sell NGP software to 'corporations, trade associations, and right-leaning 527s;' and (2) That NGP is the manufacturer of the PACBuilder software sold by Capitol Advantage under that Reseller Agreement." Pl.'s Mot. Mem. at 2. Aristotle argues that it needs to use this information freely for discovery purposes and that NGP does not have good cause for keeping this information confidential, such that it was wrongly designated as confidential. NGP and Capitol Advantage contend that it was properly designated, and removing the protection over such information requires amendment of the protective order.

### B. LEGAL STANDARD

Under the Protective Order, either party may designate as confidential anything "reasonably believed to contain trade secrets, or confidential research, development, financial, or commercial information...." Order ¶ 1; see Fed.R.Civ.P. 26(c)(1)(G); *Alexander v. FBI*, 186 F.R.D. 71, 75 (D.D.C.1998). The order does not discuss the burden of persuasion that is applicable upon a proper challenge to a confidentiality designation. Because protective orders are based on a finding of good cause to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," Fed. R.Civ.P. 26(c), the logical conclusion is that the burden of persuasion falls upon the party or parties seeking to restrict disclosure.[8] *Cf. Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121–22 (3d Cir.1986).

---

7. Pursuant to a joint motion, the Court terminated Aristotle's "Motion for Leave to Treat Certain Facts as Non–Confidential," opting to file it as a letter pursuant with the Stipulated Order. Capitol Advantage intervened for the limited purpose of opposing Aristotle's motion.

8. NGP and Capitol contend that Aristotle bears the burden of demonstrating justifica-

## C. ANALYSIS

In light of sworn statements made by Nathaniel Pearlman, Aristotle argues that NGP had no good faith basis to claim that the terms of the PAC Agreement are confidential. Aristotle also points out that NGP turned over the Reseller Agreement before the Court adopted any protective order in this case. *See* Pl.'s Mot. Mem. at 1. Mr. Pearlman's deposition testimony does clearly indicate that NGP would not be harmed by the disclosure of the terms alluded to by Aristotle. Pearlman Dep. at 106–08, 109, 112, 286. According to Aristotle, the *de minimis* harm suffered by NGP is outweighed by Aristotle's need to prepare for trial. Pl.'s Mot. Mem. at 4; *see Peskoff v. Faber*, 230 F.R.D. 25, 32 (D.D.C.2005). Aristotle claims that it must refer to these "facts" to gather data to use as evidence as to whether knowledge of the terms of the agreement "would change consumer perception of NGP or the truth of its advertising." Pl.'s Mot. Mem. at 4. As discussed in Section I, such evidence may indeed be important. But Aristotle does not need to reference this information in order to gather such evidence. Quoting or paraphrasing the relevant PAC Agreement terms in a manner that does not identify individual persons or disclose any confidential information would not violate the protective order. If Aristotle hopes to name any firms or refer specifically to PACBuilder to gather the survey data it seeks, it fails to provide any explanation as to why it would need to do so. In addition to being unnecessary, its request to treat certain "facts" as non-confidential is tantamount to asking the Court to issue findings of fact in Aristotle's own words. The Court declines to do so.

NGP posits that the terms of the PAC Agreement must remain confidential because Aristotle will likely use it to conduct misleading push-poll surveys for the purpose of gaining a competitive advantage. Beyond this speculation, NGP provides no description of harm it would suffer from such surveys. Referring to the PAC Agreement's confidentiality provision, NGP also suggests that the agreement constitutes confidential commercial information. This argument appears to be irrelevant in light of the confidentiality agreement's January 31, 2010 expiration date. PAC Agreement at 6. Capitol Advantage states, in a similarly conclusory manner, that general disclosure of the PAC Agreement and NGP's role as source of the PACBuilder software would be harmful. Capitol Advantage expresses concerns "from a marketing standpoint," but fails to articulate a coherent justification for confidentiality, particularly in light of the fact that it has disclosed its relationship with NGP to individual customers. Intervenor's Opp'n Ex. A ("Kern Aff.")

## D. DISPOSITION

On balance, it appears that, at a minimum, portions of the first two pages of the PAC Agreement were improperly designated as confidential, particularly in light of Mr. Pearlman's and Mr. Kern's statements. For this reason as well as those set forth in the next subsection, the accompanying order invites NGP to show cause as to why the seal on the PAC Agreement should not be lifted. For the reasons discussed above, Aristotle's request will nevertheless be denied.

tion for modification of the protective order. *See, e.g., Infineon Techs. AG v. Green Power Techs. Ltd.*, 247 F.R.D. 1, 2 (D.D.C.2005) (discussing factors relevant to modification of a protective order). Modification is necessary,

however, only if the Court determines both (a) that the material at issue was designated and treated properly under the protective order and (b) that there is nevertheless no good cause to protect it.

## III. MOTION FOR LIMITED INTERVENTION

### A. BACKGROUND

Pursuant to the Stipulated Agreement and Protective Order discussed in the previous section, the parties' summary judgment motions and related were filed under seal. The applicant, Alison Gregor, seeks to intervene as a member of the press so she may request that certain records filed in connection with those motions be unsealed. Aristotle consents to Ms. Gregor's motion. NGP and Capitol Advantage oppose it. Openly suspicious of Ms. Gregor's motives, NGP seeks leave to depose her, postulating that her motion was solicited by Aristotle. NGP's motion is supported by Capitol and opposed by Aristotle.

### B. LEGAL STANDARD

■ Permissive intervention is governed by Federal Rule of Civil Procedure 24(b), which provides, in pertinent part, that "[o]n timely motion, the court may permit anyone to intervene who ... has a claim or defense that shares with the main action a common question of law or fact." Fed.R.Civ.P. 24(b)(1)(B). At a minimum, the putative intervenor must present the Court with: "(1) an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action." *E.E.O.C. v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C.Cir.1998). In addition to evaluating these criteria, the Court must "consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed.R.Civ.P. 24(b)(3).

■ "As its name would suggest, permissive intervention is an inherently discretionary enterprise." *E.E.O.C. v. National Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C.Cir.1998) (citing *Hodgson v.*

*United Mine Workers of America,* 473 F.2d 118, 125 n. 36 (D.C.Cir.1972)). In deciding how to exercise its discretion, the Court may also consider such factors as the nature and extent of the applicant's interests, "the degree to which those interests are adequately represented by other parties, and whether parties seeking intervention will significantly contribute to ... the just and equitable adjudication of the legal question presented." *H.L. Hayden Co. v. Siemens Med. Sys., Inc.,* 797 F.2d 85, 89 (2d Cir.1986) (internal quotations omitted); *cf. South Dakota ex rel. Barnett v. Dept. of Interior,* 317 F.3d 783, 787 (8th Cir.2003); *Butte County v. Hogen,* 2008 WL 2410407, 2008 U.S. Dist. LEXIS 46480 (D.D.C. June 16, 2008).

### C. ANALYSIS

#### 1. Basis for Jurisdiction

Alison Gregor, a freelance journalist, seeks to intervene "for the limited purpose of unsealing various documents filed by the parties in connection with the cross-motions for summary judgment...." Mot. at 1. Although the literal text of the Rule does not identify it as an appropriate device for challenging a protective order, it has been construed "as an avenue for third parties to have their day in court to contest the scope or need for confidentiality." *E.E.O.C. v. National Children's Ctr.,* 146 F.3d 1042, 1045–46 (D.C.Cir.1998) (internal quotation and citation omitted); *see also In re Vitamins Antitrust Litig.,* No. 99–197, 2001 WL 34088808, at *3, 2001 U.S. Dist. LEXIS 25068, *30–31 (D.D.C. Mar. 19, 2001) ("where intervention is sought for the limited purpose of modification to a protective order, it is not necessary for the Court to find an independent basis for jurisdiction"); *In re Guantanamo Bay Detainee Litig.,* 630 F.Supp.2d 1, 5 (D.D.C. 2009); *see generally Eu v. San Francisco County Democratic Central Comm.,* 489

U.S. 214, 223, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989) (recognizing the importance of the First Amendment with regard to campaigns for political office). Accordingly, neither NGP nor Capitol challenges Ms. Gregor's grounds for subject matter jurisdiction. *See* NGP Opp'n at 6–7.

### 2. Timeliness of the Motion

 In considering the timeliness of the motion, the Court weighs "all the circumstances, especially ... [the] time elapsed since the inception of the suit, the purpose for which intervention is sought, the need for intervention as a means of preserving the applicant's rights, and the probability of prejudice to those already parties in [the] case." *United States v. AT & T*, 642 F.2d 1285, 1295 (D.C.Cir.1980) (discussing timeliness in context intervention as of right); *In re Vitamins Antitrust Litig.*, 2001 WL 34088808, at *3, 2001 U.S. Dist. LEXIS 25068 at *30–31. Ms. Gregor filed her motion a bit more than one year after the routine briefing was completed on the motions for summary judgment, and some six months after the last hearing in this case. In light of the nature of her request, the procedural posture of the case, and the fact that courts have held such limited intervention to be timely long after the termination of litigation, *see Nat'l Children's Center*, 146 F.3d at 1047, Ms. Gregor has satisfied the timeliness requirement.

### 3. Common Questions of Law or Fact

As with the jurisdictional and timeliness requirements, courts have liberally construed the commonality requirement in the context of challenges to protective orders. *In re Vitamins Antitrust Litig.*, 2001 WL 34088808, *4, 2001 U.S. Dist. LEXIS 25068, *32–33. Indeed, some have held that "the issue of the scope or need for the confidentiality order itself presents a common question that links the movant's chal-

lenge with the main action." *Nat'l Children's Center*, 146 F.3d at 1047 (citations omitted). Here, the only common question is whether certain materials are properly sealed-a question that had been raised by Aristotle with regard to some material prior to Ms. Gregor's motion [Dkt. Nos. 50, 53].

Ms. Gregor argues that documents submitted in connection with summary judgment motions are judicial documents to which a strong presumption of access attaches, Mot. at 5, and that this presumption cannot be overcome. She also emphasizes that the underlying subject matter is newsworthy, Mot. at 6–7. NGP and Capitol contend that Ms. Gregor has not articulated a sufficiently specific interest in this matter, and they dispute the contention that the common law presumption of public access applies to the documents at issue here.

"The common law right of public access is firmly rooted in our nation's history. . . . 'The presumption of access is based on the need for federal courts, although independent—indeed, particularly because they are independent—to have a measure of accountability and for the public to have confidence in the administration of justice.'" *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir.2006) (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir.1995)). Along the same lines, the D.C. Circuit has explained that "the meaning and legal import of a judicial decision is a function of the record upon which it was rendered. This principle, of course, assumes a judicial decision. If none occurs, documents are just documents; with nothing judicial to record, there are no judicial records." *United States v. El–Sayegh*, 131 F.3d 158, 162 (D.C.Cir.1997) (quotations and citations omitted). Additionally, the Court must take care to protect sensitive information

and prevent abuses of discovery. *See generally* Local Civ. R. 5.4(e)(2) (filing under seal); Local Civ. R. 5.4(f) (privacy). In sum, "what makes a document a judicial record and subjects it to the common law right of access is the role it plays in the adjudicatory process." *El–Sayegh*, 131 F.3d at 161. Accordingly, documents considered by the Court in connection with a dispositive motion are often, but not always, subject to a presumption of access, as recognized by Rule 26(c).

■ The accompanying order duly requires that this opinion and the record evidence discussed herein be unsealed in two weeks unless either party shows cause as to why they should remain under seal. *Cf. Procter & Gamble v. Bankers Trust*, 78 F.3d 219, 227 (6th Cir.1996) ("the District Court cannot abdicate its responsibility to . . . determine whether filings should be made available to the public" by allowing the parties to control public access pursuant to a protective order). The Court therefore reasons that Ms. Gregor's motion is largely, if not entirely, moot. Additionally, in light of Aristotle's analogous request [Dkt. Nos. 50, 53] and brief in support of disclosure [Dkt. Nos. 96, 97] (filed in connection with Ms. Gregor's motion) the Court concludes that the interest in public access will be adequately addressed by Aristotle going forward.[9]

### 4. Prejudice

Ms. Gregor emphasizes that she "seeks only documents relating to whether NGP's claims of pure partisanship are true, and whether NGP has attempted to conceal the truth about its apparent relationship with [Capitol]." Mot. at 11. She identifies a dozen categories of documents that she

would be interested in, assuming they have been filed in connection with the parties motions for summary judgment. Mot. at 11–12. NGP argues that such intervention, if it results in the disclosure of certain documents, could cause substantial prejudice to NGP. NGP further alleges that most of the documents Ms. Gregor seeks, including deposition transcripts and interrogatory responses, "were exchanged in discovery by NGP in specific reliance on the parties' Stipulated Confidentiality Agreement. Capitol echoes this concern, claiming that disclosure of certain confidential information would "defeat [its] marketing strategy, wrongfully case doubt on [its] integrity" and thereby allow Aristotle to gain a competitive edge.

Both NGP's and Capitol's arguments concerning prejudice are premature. Whether and to what extent documents should be unsealed is a separate inquiry. The question before the Court is merely whether the applicant should be permitted to join the proceeding and bring that inquiry before the Court. Neither NGP nor Capitol identifies any undue prejudice that would result from the applicant's limited, controlled access to certain documents. Review of each piece of sealed evidence that Ms. Gregor is interested in, however, would undoubtedly cause some additional delay. In light of Aristotle's supporting brief [Dkt. Nos. 96, 97], and previous request to "treat certain facts as non-confidential" [Dkt. No. 50], it also appears that Ms. Gregor's efforts would be duplicative. Such inconvenience does not necessarily rise to the level of undue prejudice, but in the interest of efficiency, the Court will disallow intervention at this time.

---

9. The Court reaches this conclusion in part because Aristotle has been waiting for a Court order in response to its request for leave to "treat certain facts as non-confidential." Since that request was pending, the fact that Aristotle had not submitted a broader motion to unseal records does not imply that it has an insufficient interest disclosure.

**D. DISPOSITION OF MOTIONS TO INTERVENE AND TO DEPOSE APPLICANT**

Having considered Rule 24(b), the posture of the case, the relevant arguments, and the entire record, the Court finds that Ms. Gregor has satisfied the minimum criteria for permissive intervention. For the foregoing reasons, however, the Court will deny her motion to intervene *without prejudice*. The Court will therefore deny NGP's Motion to Depose Ms. Gregor as moot.

## CONCLUSION

For the foregoing reasons, the Court will **DENY** the parties' cross-motions for summary judgment on Aristotle's Lanham Act claim as well as those on NGP's counterclaim. The Court will also **DENY** Alison Gregor's Motion to Intervene without prejudice. NGP's Motion to Depose Ms. Gregor will be **DENIED** as moot. Aristotle's "Motion for Leave to Treat Certain Facts as Non–Confidential" will likewise be **DENIED**. The Court will hold NGP's Motion for Leave to File a Supplemental Memorandum in abeyance.

An appropriate order accompanies this memorandum opinion.